## ORAL ARGUMENT REQUESTED

Case No. 14-4162

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
_____

BRENT LEVORSEN

Plaintiff-Appellant

v.

OCTAPHARMA PLASMA, INC.

Defendant-Appellee

_____

Appeal from the United States District Court
For the District of Utah, No. 2:14-cv-00325
The Honorable Dustin B. Pead, Magistrate Judge, Presiding

### BRIEF OF PLAINTIFF-APPELLANT BRENT LEVORSEN

Sasha Samberg-Champion
Michael Allen
Ryan C. Downer
RELMAN, DANE & COLFAX PLLC
1225 19th Street, N.W. Suite 600
Washington, D.C. 20036
(202) 728-1888
(202) 728-0848 (fax)

Aaron M. Kinikini
Disability Law Center
205 North 400 West
Salt Lake City, Utah 84103
(801) 869-2708
(801) 363-1437 (fax)

*Attorneys for Plaintiff-Appellant*

## <u>DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST</u>

      Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant makes the following disclosures:

1.     Is said party a subsidiary or affiliate of a publicly-owned company?

      **No.**

      If the answer is YES, list below the identity of the parent corporation or affiliate and the relationship between it and the named party.

      **Not applicable.**

2.     Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

      **No.**

      If the answer is YES, list below the identity of such corporation and the nature of the financial interest.

      **Not applicable.**


 s/ Sasha Samberg-Champion                 April 27, 2015

Sasha Samberg-Champion                      Date

Attorney for Plaintiff-Appellant

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATMENT ....................................................... i

TABLE OF CONTENTS ............................................................................... ii

TABLE OF AUTHORITIES ......................................................................... iv

STATEMENT OF RELATED CASES ......................................................... vii

INTRODUCTION ......................................................................................... 1

STATEMENT OF JURISDICTION ............................................................... 2

STATEMENT OF ISSUES ........................................................................... 3

STATEMENT OF THE CASE ...................................................................... 4

      A. Factual Background ........................................................................ 4

      B. Course Of Proceedings Below ....................................................... 6

SUMMARY OF ARGUMENT ...................................................................... 7

ARGUMENT ................................................................................................ 9

  I.     Standard Of Review ......................................................................... 9

  II.    Plasma Donation Centers Are "Public Accommodations"
       And Are Covered By Title III Of the ADA ...................................... 9

      A. The Term "Service Establishment" Should Be Construed
         Broadly And Not Limited To Establishments Similar To
         The Particular Examples Denoted In The Text ............................ 10

          1. The Term "Service Establishment" Is A Broad
             One, As Congress Intended ..................................... 10

          2. The ADA's Broad Purpose and Legislative
             History Preclude The Application of *Esjusdem
             Generis* To Narrow The Scope Of The Term "Service
             Establishment" ...................................................... 14

B. Plasma Donation Centers Provide Services And Qualify As
Service Establishments Under The ADA ...................................................... 19

1. Plasma Donation Centers Provide Services To
Donors In A Bargained-for Exchange ......................................... 19

2. The Exchange Between Plasma Donation Center
And Donor Is Similar To The Business-Customer
Relationship At Other Covered Entities And Does
Not Remove The Center From Title III's Coverage .................. 21

3. The Nature Of The Exchange Is Ultimately Irrelevant
To Title III's Coverage ............................................................... 23

CONCLUSION ........................................................................................................ 26

STATEMENT REGARDING ORAL ARGUMENT ...................................... 27

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ............................... 28

CERTIFICATE OF DIGITAL SUBMISSION ................................................. 29

CERTIFICATE OF SERVICE ........................................................................... 30

# TABLE OF AUTHORITIES

**CASES**                                                            **PAGE**

*Bragdon v. Abbott*, 524 U.S. 624 (1998) ........................................................................ 18

*Branche v. Airtran Airways, Inc.*, 342 F.3d 1248 (11th Cir. 2003)............................. 12, 13

*Brown v. Montoya*, 662 F.3d 1152 (10th Cir. 2011) ........................................................ 9

*Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England,*
    *Inc.*, 37 F.3d 12 (1st Cir. 1994) ....................................................................... 15, 24

*Colo. Cross Disability Coal. v. Hermanson Family Ltd.,*
    264 F.3d 999 (10th Cir. 2001) ........................................................................ 18

*Conn. Nat'l. Bank v. Germain*, 503 U.S. 249 (1992) .................................................. 12, 14

*Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557 (7th Cir. 1999)............................. 15, 16, 25

*F.D.I.C. v. Meyer*, 510 U.S. 471 (1994) ........................................................................ 13

*Harrison v. PPG Indus., Inc.*, 446 U.S. 578 (1980) ........................................................ 14

*Hodges v. Delta Airlines, Inc.*, 44 F.3d 334 (5th Cir. 1995) ............................................ 12

*Maley v. Octapharma Plasma, Inc.*, No. 12-13892, 2013 WL 3814248,
    (E.D. Mich. July 22, 2013) ..........................................................................25

*Miller v. Amusement Enters. Inc.*, 394 F.2d 342 (5th Cir. 1968) ............................... 15, 18

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ........................................... 13

*Nat'l Fed. of the Blind v. Scribd, Inc.*, No. 14-162, 2015 WL 1263336
    (D. Vt. Mar. 19, 2015)................................................................................ 19, 25

*Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196 (D. Mass. 2012) ................ 19

*N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.,*
    248 F.3d 1277 (10th Cir. 2001) .................................................................... 12, 14

*Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117 (1991) ................. 14

*Pallozzi v. Allstate Life Ins. Co.*, 198 F.3d 28 (2d Cir. 1999) ............................................ 24

*PGA Tour, Inc. v. Martin*, 532 U.S. 661 (2001).............................. 1, 2, 7, 8, 10, 14, 23, 24

*Phibbs v. Am. Prop. Mgmt.*, No. 02-260, 2008 WL 746977 (D. Utah Mar. 19, 2008).................19

*Smith v. United States*, 561 F.3d 1090 (10th Cir. 2009)........................................................ 9

*St. Charles Inv. Co. v. C.I.R.*, 232 F.3d 773 (10th Cir. 2000) ........................................... 12

*Stevens v. Premier Cruises, Inc.*, 215 F.3d 1237 (11th Cir. 2000).................................... 24

*United States v. Alpers*, 338 U.S. 680 (1950)..................................................................... 15

*Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104 (9th Cir. 2000) .................. 25

## FEDERAL STATUTES AND REGULATIONS                    PAGE

28 U.S.C. § 1291 .............................................................................................................3

28 U.S.C. § 1331 .............................................................................................................3

28 U.S.C. § 1343 .............................................................................................................3

42 U.S.C. § 12101 .......................................................................................................13, 18

42 U.S.C. § 12181 ......................................................................... 4, 10-11, 17, 19, 20, 22, 23

42 U.S.C. § 12182 ....................................................................................................1, 3, 10, 24

42 U.S.C. § 1320b-5 .....................................................................................................20

42 U.S.C. § 1395x .........................................................................................................20

42 U.S.C. § 300jj ...........................................................................................................20

28 C.F.R. Part 36, App. C...........................................................................................17, 18

**LEGISLATIVE HISTORY** **PAGE**

H.R. Rep. No. 101-485 (1990) .......................................................................8, 13, 15, 16

H.R. Conf. Rep. No. 101-558 (1990) .........................................................................2, 17

S. Rep. No. 101-116 (1989)................................................................................13, 15, 16

**OTHER AUTHORITIES**

*About Octapharma Plasma*, http://octapharmaplasma.com/about .....................................4

Andrew Pollack, *Is Money Tainting The Plasma Supply*, N.Y. Times, Dec. 5, 2009,
      *available at* http://www.nytimes.com/2009/12/06/business/06plasma.html?
      pagewanted=all&_r=0 .........................................................................................22

Merriam-Webster Dictionary (2015)........................................................................ 12-13

Octapharma 2013 Annual Report 4,
      http://www.octapharma.com/index.php?eID=tx_nawsecuredl&u=0&file=uploads/
      media/AR2013_Web.pdf&t=1420755433&hash=daaaa357c0bdf1b0b0e9feb8ec53
      e183d811414c..................................................................................................4

U.S. Dept. of Justice, Civil Rights Division, Title III Technical Assistance Manual,
      *available at* http://www.ada.gov/taman3.html. ...................................................17

## STATEMENT OF RELATED CASES

There are no prior or related appeals in this matter.

# INTRODUCTION

This appeal arises from a district court's cramped interpretation of Title III of the landmark Americans with Disabilities Act of 1990 (ADA).  Plaintiff Brent Levorsen alleges that Octapharma Plasma, Inc., discriminated against him on the basis of disability when it refused to permit him to be a donor at a plasma donation center.  The district court dismissed the complaint, holding that a plasma donation center is not a public accommodation subject to Title III's protections.  Its decision is contrary to Title III's text, Congress's clear purpose, and authoritative agency interpretation.  This Court should reverse.

In furtherance of the ADA's ambitious purpose of eradicating barriers to full participation in public life, Title III bars discrimination on the basis of disability in "any place of public accommodation."  42 U.S.C. § 12182(a) (Add. at 6[1]).  Congress defined "public accommodation" broadly, in terms of twelve "extensive categories" that are to be "construed liberally to afford people with disabilities equal access to the wide variety of establishments available to the nondisabled."  *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 662 (2001).  One such category is "service establishment," a term that by its plain meaning covers any entity that performs services for the general public.  That meaning is expansive enough to cover plasma donation centers, particularly in light of Congress's clear intent that "public accommodation" be construed liberally to cover all commercial

---

[1] "Add." refers to the consecutively paginated Statutory and Regulatory Addendum bound to Plaintiff-Appellant's opening brief.

establishments open to the public (as well as certain non-commercial establishments such as museums and food banks).

Inappropriately applying the principle of *ejusdem generis,* the district court erroneously narrowed the scope of the broad term "service establishment" and held that Mr. Levorsen could not proceed against Octapharma. Title III lists several specific examples of "service establishments," such as laundromats, banks, and health care providers. Instead of directly inquiring whether plasma donation centers fit within the plain meaning of "service establishment," the district court asked whether plasma donation centers are similar to those examples. It concluded that they are not, on the basis that customers receive money from plasma donation centers rather than vice versa.

Such reasoning is misplaced here because Congress clearly did not intend to narrow the otherwise broad term "service establishment" through the use of illustrative examples. Indeed, Congress specifically considered and rejected a requirement that a covered entity be "*similar*" to those expressly identified. H.R. Conf. Rep. No. 101-558, at 61 (1990) (Add. at 25). That drafting decision is consistent with Congress's general intent that Title III guarantee individuals with disabilities "equal access to the wide variety of establishments available to the nondisabled." *PGA Tour Inc*., 532 U.S. at 662. And to the extent any ambiguity remains, the Department of Justice's authoritative interpretation confirms that the reach of "service establishment," as well as Title III's other eleven categories of public accommodation, should not be narrowed to those entities similar to the illustrative examples Congress chose.

Once "service establishment" is given its proper, broad reach, no basis remains for the district court's holding.  Plasma donation centers provide a "service" to their customers as part of a bargained-for exchange.  Customers receive money; plasma donation centers receive plasma that they can sell for more money, such that they turn a profit on the transaction.  And plasma donation centers facilitate this transaction, one that a customer could not otherwise make, by providing services – such as blood screening and extraction – that require technical expertise.  That their business model calls for a customer to receive money rather than pay money is irrelevant to the services they provide.  The district court offered no reason, and none exists, why Congress would want Title III's reach to turn on such an arbitrary distinction.

## STATEMENT OF JURISDICTION

Mr. Levorsen brought his claims below under Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12182, *et seq.* (Add. at 6-9).  The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4).

In a decision dated December 1, 2014, the district court granted Octapharma's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and entered final judgment in Octapharma's favor.  (Aplt. App. at 43).  Mr. Levorsen filed a timely Notice of Appeal on December 24, 2014.  (Aplt. App. at 44).  This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## ISSUE PRESENTED

One of the twelve categories of "public accommodations" covered by Title III of the ADA is:

3

a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, *or other service establishment*.

42 U.S.C. § 12181(7)(F) (Add. at 4) (emphasis added).

The question presented is whether Defendant Octapharma Plasma, Inc. and other plasma donation centers are "other service establishments" that, like all public accommodations, are subject to Title III's requirements banning discrimination on the basis of disability.

## STATEMENT OF THE CASE

### A.  Factual Background

Defendant Octapharma Plasma, Inc., operates plasma donation centers, including the one at issue in this case in Salt Lake City, Utah.  Plasma donation centers are private businesses that pay blood donors for their "source plasma."  That source plasma then is used as the source material for manufacturing various blood-based products.  (Aplt. App. at 8 ¶ 10).[2]

Plaintiff Brent Levorsen has certain psychiatric disabilities, such as borderline schizophrenia, for which he takes medications that control his symptoms.  (Aplt. App. at

---

[2] According to its website, Octapharma Plasma, Inc. runs more than 45 plasma donation centers around the United States.  *See About Octapharma Plasma*, http://octapharmaplasma.com/about.  Octapharma's parent company, Octapharma AG, is a multinational corporation based in Switzerland with more than 1 billion Euro in annual revenues.  *See* Octapharma 2013 Annual Report 4, http://www.octapharma.com/index.php?eID=tx_nawsecuredl&u=0&file=uploads/media/AR2013_Web.pdf&t=1420755433&hash=daaaa357c0bdf1b0b0e9feb8ec53e183d811414c.

8 ¶ 8, 9 ¶¶ 14-15).  For years, Mr. Levorsen has donated his source plasma for money on a regular basis.  The money he receives for these donations – about $260 per month – is a critical supplement to his otherwise very limited income.  (Aplt. App. at 8 ¶ 11; 10 ¶ 21).

On or about May 6, 2013, Mr. Levorsen attempted to donate source plasma at Octapharma's Salt Lake City location.  (Aplt. App. at 8 ¶ 12).  An Octapharma employee gave him a medical examination.  Such an examination is routinely performed to ensure that a donor has no medical issue that would make it unsafe to donate blood or would affect the quality of the donated blood.  (Aplt. App. at 8 ¶ 13).  During this examination, Mr. Levorsen disclosed the medications he was taking.  Asked why he was taking one of those medications, Mr. Levorsen disclosed his borderline schizophrenia.  (Aplt. App. at 9 ¶¶ 14-15).  Mr. Levorsen then was told that he could not donate source plasma. Octapharma did not claim that Mr. Levorsen was physically unfit to give blood or that his blood would be unsuitable.  Instead, he was told that Octapharma feared that Mr. Levorsen would have a schizophrenic episode while donating, during which time he would rip the needle out of his arm and hurt himself or others.  (Aplt. App. at 9 ¶ 16).

In addition to depriving Mr. Levorsen of the opportunity to donate plasma at the Salt Lake City facility, Octapharma placed Mr. Levorsen on the National Donor Deferral Registry, a list of people unfit to give blood.  By doing so, Octapharma barred Mr. Levorsen from giving blood at any other plasma bank in the country.  (Aplt. App. at 9 ¶ 17).  Before taking these actions, Octapharma did not consider Mr. Levorsen's history or his actual behavior, which would have given them no reason to consider him unfit to give blood.  (Aplt. App. at 9 ¶ 16; 11 ¶¶ 30-31).

5

Mr. Levorsen gave Octapharma certifications signed by two separate physicians, both of whom warranted that Mr. Levorsen was suitable to continue giving blood. (Aplt. App. at 9-10 ¶ 19). On or about May 23, 2013, Octapharma told Mr. Levorsen it would simply discard these certifications. (Aplt. App. at 10 ¶ 20).

## B. Course Of Proceedings Below

Mr. Levorsen sued Octapharma in the U.S. District Court for the District of Utah, alleging that Octapharma violated Title III of the ADA. He sought declaratory and injunctive relief, as well as attorney's fees and costs.[3] (Aplt. App. at 16). The district court (Pead, M.J.) dismissed the complaint on the pleadings, ruling that the plasma bank operated by Octapharma is not a public accommodation covered by Title III.[4]

The district court acknowledged that the Supreme Court has held that the term "public accommodation," which governs Title III's reach, "must be construed liberally." (Aplt. App. at 34) (internal quotation marks omitted). It also acknowledged that "the term 'other service establishment' is inexact." Nonetheless, the district court held, a plasma bank is not a "service establishment," because it is too dissimilar to the examples of service establishments provided in the statutory definition. (Aplt. App. at 37).

With respect to the statutory examples, the district court found "a similarity between each—an establishment, in return for payment, provides a service to a member of the public." (Aplt. App. at 37). By contrast, it reasoned, in this case "it is the plasma donation center that offers money to a member of the public in exchange for a service to

---

[3] Title III does not permit a recovery of damages.
[4] The parties consented to having the Magistrate Judge conduct all proceedings.

the center—the donation of plasma." (Aplt. App. at 37). This distinction, the district court held, "creates a fundamental difference between plasma donation centers and the other establishments listed" and "precludes the inclusion of plasma donation centers" within the definition of "service establishment." (Aplt. App. at 38). For similar reasons, it found that plasma donation centers are not "health care providers," since "a health care provider provides a service to the public in return for compensation." (Aplt. App. at 40).

The district court acknowledged the "emotional appeal" of Mr. Levorsen's claim, given "the seeming lack of proportionality between Octapharma's safety concerns, which never manifested (and based upon Mr. Levorsen's doctor's evaluations were unlikely to ever do so), and the wholesale exclusion of Mr. Levorsen from the plasma donation process." (Aplt. App. at 41). It also acknowledged that the reasoning of this decision would exclude from the coverage of Title III other facilities that "facilitate an individual's donation of a biological material," including not only blood donation but also "sperm donation, egg donation, blood marrow donation and stem cell donation." (Aplt. App. at 41). The district court did not attempt to justify the reasonableness of such an exclusion as a matter of policy or congressional intent, but instead stated that the matter was "a question most appropriately directed to the United States Congress." (Aplt. App. at 41-42).

## SUMMARY OF ARGUMENT

With the passage of the ADA, Congress set out "to eliminate discrimination against disabled individuals, and to integrate them 'into the economic and social mainstream of American life.'" *PGA Tour Inc*., 532 U.S. at 674-75 (citing legislative

history).  In order to accomplish this ambitious task, Congress enacted statutory provisions that were intended to be "broad," "sweeping," and "comprehensive" in their scope.  *Id*.  Just as Title I of the ADA covers all types of employers and Title II covers all functions of public entities, Congress meant Title III to apply to all other entities "open to the public."   H.R. Rep. No. 101-485, pt. 2, at 35 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 317 (Add. at 19).

To accomplish that goal, Congress defined a "public accommodation" subject to Title III's requirements using twelve broad categories.  The term Congress used for the category at issue here – "service establishment" – is an expansive one.  Congress chose such a broad term deliberately, consistent with its stated intent that Title III should cover virtually every commercial entity open to the public.  It made clear that the broad terms it chose to define "public accommodation" may not be narrowed to those entities similar to the examples set forth in the text.  The breadth of the term "service establishment," as well as Title III's other categories of public accommodation, is confirmed by the Department of Justice's authoritative interpretation.  *See* Point II.A.

No reason exists to exclude plasma donation centers from Title III's broad coverage.  Such entities provide services to customers as part of a bargained-for exchange, which is all that is required.  It is irrelevant that plasma donation centers have a business model that involves paying money to customers, rather than vice versa.  *See* Point II.B.

## ARGUMENT

### I.     Standard Of Review

As the sufficiency of a complaint is a question of law, this Court must review de novo the district court's grant of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), applying the same standards as the district court.  *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).  That is, "all well-pleaded factual allegations in the . . .  complaint are accepted as true and viewed in the light most favorable to the nonmoving party."  *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011) (internal quotation marks omitted).  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Smith*, 561 F.3d at 1098 (internal quotation marks omitted).

### II.    Plasma Donation Centers Are "Public Accommodations" And Are Covered By Title III Of The ADA

Congress defined a "public accommodation" covered by Title III broadly, as anything that falls into one or more of twelve wide-ranging categories.  One of those categories is "service establishment," a term with a plain meaning that is easily expansive enough to include plasma donation centers such as Octapharma's.  The district court could conclude otherwise only by construing that term to include a requirement – that the establishment's business model involve cash payments by the public, rather than payments to the public – that appears nowhere in the text.  It erroneously reasoned that the principle of *ejusdem*

*generis* requires that, to be a covered "service establishment," an entity must be similar in all respects to the specific types of service establishments listed in the statute. Such a cramped interpretation of Title III would undermine the ADA's broad purposes, and for that reason Congress specifically rejected statutory language that would allow it.

**A. The Term "Service Establishment" Should Be Construed Broadly And Not Limited To Establishments Similar To The Particular Examples Denoted In The Text**

      1.  The Term "Service Establishment" Is A Broad One, As Congress Intended

Aiming to eradicate barriers to full participation in public life, Title III proscribes discrimination against any individual "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a) (Add. at 6). "Public accommodation" is defined in terms of twelve "extensive categories" that are to be "construed liberally to afford people with disabilities equal access to the wide variety of establishments available to the nondisabled." *PGA Tour Inc.*, 532 U.S. at 662. Each of the twelve categories includes specific examples for illustrative purposes.[5] One of those categories, relating to "service establishments," covers:

---

[5] The full definition of "public accommodation" reads:

    The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce--

    (A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;

10

a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment.

42 U.S.C. § 12181(7)(F).

The final, catch-all phrase – "or other service establishment" – is a broad one that readily covers the plasma donation center at issue here.  Statutory interpretation begins

---

(B) a restaurant, bar, or other establishment serving food or drink;

(C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

(D) an auditorium, convention center, lecture hall, or other place of public gathering;

(E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

(F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

(G) a terminal, depot, or other station used for specified public transportation;

(H) a museum, library, gallery, or other place of public display or collection;

(I) a park, zoo, amusement park, or other place of recreation;

(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

(L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

42 U.S.C. § 12181(7) (Add. at 4-5).

11

with the plain language of the term to be construed.  *N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277, 1281 (10th Cir. 2001).  This is so even where observing an alternative canon of construction might lead to a different result.  As the Supreme Court has explained:

> Canons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.

*Conn. Nat'l. Bank v. Germain*, 503 U.S. 249, 253-54 (1992).  Accordingly, "[w]hen the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"  This Court must "assume that Congress's intent is expressed correctly in the ordinary meaning of the words it employs."  *St. Charles Inv. Co. v. Comm'r*, 232 F.3d 773, 776 (10th Cir. 2000).  "[A]bsent ambiguity or irrational result, the literal language of a statute controls."  *Id.* (internal quotation marks omitted).

In light of these principles, the term "service establishment" presumptively should be read, in accordance with its plain meaning, to embrace within its ambit a wide variety of facilities.  Courts have recognized in other contexts that the word "service" "generally refers to *any* bargained-for exchange of an intangible benefit."  *Branche v. Airtran Airways, Inc.*, 342 F.3d 1248, 1257 (11th Cir. 2003) (emphasis in the original) (citing *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 337 (5th Cir. 1995) (en banc)).  Consistent with that common, broad usage, the standard dictionary meaning of the word "service" encompasses, among other things, any "facility supplying some public demand," "useful labor that does not produce a tangible commodity," and "a facility providing maintenance

and repair." *See* Merriam-Webster Dictionary (2015).  The coverage of "service establishment" thus complements that of "sales or rental establishment," which covers bargained-for exchanges of *tangible* benefits.

Nothing in the text of the ADA indicates that Congress "intended to deviate from this standard definition," and so this Court must assume that the ordinary meaning "accurately expresses the legislative purpose."  *Branche*, 342 F.3d at 1257 (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992); *accord F.D.I.C. v. Meyer*, 510 U.S. 471, 476 (1994).  Against this background, a natural reading of the term "service establishment" plainly includes any facility, open to the public, where commercial exchange involving an intangible benefit is conducted.

Giving the term "service establishment" its natural reading will not give Title III unintended breadth, because Congress clearly intended Title III to sweep broadly.  *See* H.R. Rep. No. 101-485, pt. 3, at 54 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 477 (Add. at 22-23) (discussing the intended breadth of the Title III categories); S. Rep. No. 101-116, at 53-54 (1989) (Add. at 27-28) (same).  Congress crafted an expansive definition of "public accommodation" that it meant to cover all entities that affect commerce and are "open to the public."  H.R. Rep. No. 101-485, pt. 2, at 35 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 317 (Add. at 19) (emphasis added).  Title III plays a critical part in accomplishing the ADA's overall purpose of making all areas of public life more accessible to people with disabilities.  *See* 42 U.S.C. § 12101(a)(1) (Add. at 1) (noting the ADA's purpose of ensuring that "physical or mental disabilities in no way diminish a person's right to fully participate in *all aspects* of society") (emphasis added).

13

It was designed to ensure that individuals with disabilities have "equal access to the *wide variety* of establishments available to the nondisabled."  *PGA Tour Inc.*, 532 U.S. at 662 (emphasis added).

2. The ADA's Broad Purpose And Legislative History Preclude The Application of *Esjusdem Generis* To Narrow The Scope Of The Term "Service Establishment"

The district court never attempted to apply the plain and ordinary meaning of the term "service establishment," although this Court and the Supreme Court have made clear that its analysis should have started there.  *See Conn. Nat'l. Bank*, 503 U.S. at 253-54 (examination of plain language of text is the "one, cardinal canon" on which courts should rely before all other others); *accord N.M. Cattle Growers Ass'n*, 248 F.3d at 1281.  Instead, the district court looked to the examples of such establishments specifically identified in the statutory text and then required that a "service establishment" be something that is similar to those examples in all respects.  Specifically, the district court found it dispositive that plasma donation centers pay money to their customers rather than vice versa, thus differentiating a plasma donation center's business model from that of the exemplar service establishments.  (Aplt. App at 37).  This entire line of reasoning was invalid.

The district court inappropriately applied the principle of *ejusdem generis*—that, "where general words follow an enumeration of specific items, the general words are read as applying only to other items akin to those specifically enumerated."  *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588 (1980).  But the canon of *ejusdem generis* "does not control when the whole context dictates a different conclusion."  *Norfolk & W. Ry. Co. v.*

14

*Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991).  Although "*ejusdem generis* is an old and accepted rule of statutory construction," it does not compel this Court to "accord words and phrases embodied in the statute a definition or interpretation different from their common and ordinary meaning," or require it "to interpret the statute in such a narrow fashion as to defeat . . . its obvious and dominating general purpose."  *Miller v. Amusement Enters. Inc.*, 394 F.2d 342, 350 (5th Cir. 1968) (en banc); *accord United States v. Alpers*, 338 U.S. 680, 682 (1950).  Applying *ejusdem generis* to narrow the reach of Title III would do exactly that.

"In drafting Title III, Congress intended that people with disabilities have equal access to the array of goods and services offered by private establishments and made available to those who do not have disabilities."  *Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 19 (1st Cir. 1994) (citing S. Rep. No. 101-116, at 58 (1989) (Add. at 29)).  Congress concluded that, given the ADA's integrative aims, Title III had to apply expansively to *all* private businesses open to the public.  *See* H.R. Rep. No. 101-485, pt. 2, at 35 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 317 (Add. at 19-20) (it simply "makes no sense for a law to say that people with disabilities cannot be discriminated against if they want to buy a pastrami sandwich at the local deli" but to allow such discrimination at other establishments equally open to the general public).  There is no indication that Congress intended to exclude certain businesses from coverage based on distinctions such as the nature of the exchange between business and consumer.  *See Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir. 1999) (internal citation omitted) (Congress intended that "the owner or operator

15

of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or other facility that is open to the public cannot exclude disabled persons from entering the facility.").  Rather, Congress's aim was to ensure that, for all manner of establishments, individuals with disabilities would be able to "us[e] the facility in the same way that the nondisabled do." *Id.*

In that spirit, a House Report explains that the list of examples in the definition of "public accommodations" is not meant to be a limitation on the more general catchall categories:

> A person alleging discrimination *does not have to prove that the entity being charged with discrimination is similar to the examples listed* in the definition. Rather, the person must show that the entity falls within the overall category. For example, it is not necessary to show that a jewelry store is like a clothing store.  It is sufficient that the jewelry store sells items to the public.

H.R. Rep. No. 101-485, pt. 3, at 54 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 477 (Add. at 23) (emphasis added).  A Senate Report correspondingly states that

> within each of these categories, the legislation only lists a few examples and then, in most cases, adds the phrase "other similar" entities.  The Committee intends that the "other similar" terminology should be construed liberally consistent with the intent of the legislation that people with disabilities should have equal access to the array of establishments that are available to others who do not currently have disabilities.

S. Rep. No. 101-116, at 54 (1989) (Add. at 28).

Not only did Congress thus express its clear intent in authoritative legislative history, but it took pains to enact statutory text that ensured that the twelve categories would be construed broadly enough to capture the many kinds of commercial establishments open to the public, not just those similar to the enumerated ones.  As the Senate Report language quoted above indicates, the version of Title III that passed the

16

Senate used the word "similar" as a qualifier for each of the catch-all terms ("service

establishment," "place of education," etc.) used to define "public accommodation."  The

conference committee reconciling the Senate and House versions of the bill removed the

word "similar." [6]  Congress thus specifically considered and rejected language that

would have required "other service establishments" to be "*similar* service

establishments."  H.R. Conf. Rep. No. 101-558, at 61 (1990) (Add. at 25).

Consistent with that drafting history, the Justice Department – which was charged

by Congress with adopting regulations to implement and construe the ADA –

immediately made clear that, while Title III's "list of *categories* is exhaustive, the

*representative examples* of facilities within each category are not."  28 C.F.R. Part 36,

App. C at 893 (2011) (Add. at 17).[7]  To illustrate this point, the Department pointed to 42

U.S.C. § 12181(7)(K) (Add. at 5), which applies Title III's requirements to "a day care

center, senior citizen center, homeless shelter, food bank, adoption agency, or other social

service center establishment."  It stated that this provision should not be limited to "the

---

[6] The Conference Report states in pertinent part:

> The Senate bill lists a number of specific types of entities that are considered
> public accommodations and then includes the following catch-all phrase "and
> other similar places."

> The House amendment deletes the term "similar." In addition, the House
> amendment makes several technical changes to the categories.

> The Senate recedes.

[7] *See also* U.S. Dept. of Justice, Civil Rights Division, Title III Technical Assistance
Manual, *available at* http://www.ada.gov/taman3.html.

types of establishments listed," but also should be read to cover somewhat different "establishments such as substance abuse treatment centers, rape crisis centers, and halfway houses." 28 C.F.R. Part 36, App. C at 893 (2011) (Add. at 17). Similarly, it stated, the category of "sales or rental establishments" should be construed to "include an innumerable array of facilities that would sweep far beyond the few examples given in the regulation." *Id.* The Department thus made clear that the twelve broad categories of public accommodation should not be limited to those that are of the same "type" as the exemplar establishments. Its views are reasonable and are entitled to deference. *See Bragdon v. Abbott*, 524 U.S. 624, 646 (1998); *see also Colo. Cross Disability Coal. v. Hermanson Family Ltd.*, 264 F.3d 999, 1004 & n.6 (10th Cir. 2001) (deferring to Justice Department's construction of Title III).

The bottom line is that it would directly contravene congressional intent to draw such arbitrary boundaries on the scope of an Act intended to "invoke the sweep of congressional authority" in order to address "major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b)(4) (Add. at 2). The district court offered no reason why Congress would have wanted certain commercial enterprises open to the public to be exempt from Title III's requirements, and no such reason exists. Such a cramped interpretation of Title III would frustrate Congress's "obvious and dominating general purpose" to promote the full integration of people with disabilities into, and their participation in, the public sphere. *Miller*, 394 F.2d at 350. This Court should hold that Title III's twelve categories of public accommodation should be given the fullest scope that their language can bear, and should not be restricted to entities that are similar to the

18

enumerated examples.[8]  *See Nat'l Fed. of the Blind v. Scribd, Inc.*, No. 14-162, 2015 WL 1263336, at *6 (D. Vt. Mar. 19, 2015); *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196, 200 (D. Mass. 2012).

### B. Plasma Donation Centers Provide Services And Qualify As Service Establishments Under the ADA

#### 1. Plasma Donation Centers Provide Services To Donors In A Bargained-for Exchange

Once the term "service establishment" in 42 U.S.C. § 12181(7)(F) (Add. at 4) is given its proper, broad scope, it clearly applies to plasma donation centers.  Such establishments provide a "service" to their customers as part of a bargained-for exchange. The district court's conclusion otherwise is based not only on a cramped understanding of what a covered "service" can be, but also upon a misapprehension of the financial bargain between plasma donors and plasma donations centers.

Potential donors, like Mr. Levorsen, do not go to a plasma donation center in order to perform a service for that establishment, as the district court incorrectly reasoned. Rather, donors possess a resource—source plasma—that has commercial value.  Donors,

---

[8] *Phibbs v. Am. Prop. Mgmt.*, No. 02-260, 2008 WL 746977 (D. Utah Mar. 19, 2008), on which the district court relied to support application of *ejusdem generis* to narrow Title III's scope, should not be followed to the extent it is inconsistent with this discussion.  In *Phibbs*, the plaintiff attempted to bring a Title III claim aimed at a private residential complex.  The court correctly found that such a complex is not "an inn, hotel, motel, or other place of lodging" covered by Title III, but rather is covered by certain provisions of the Fair Housing Act.  In doing so, the court observed the dissimilarity between an apartment complex and an "inn, hotel, [or] motel."  But this observation was unnecessary, since (as the court pointed out) Title III's legislative history makes clear that Congress did not intend the term "place of lodging" to apply to private residences.

however, cannot realize that commercial value without the technical expertise and market access provided by a donation center.  In that regard, a plasma donation center provides at least two discrete services: (1) screening the individual's blood to ensure the donor's eligibility for donation and (2) using its technology and trained personnel to extract and properly process the individual's plasma.  As a result of the services provided by the plasma donation center, the donor's plasma is converted from raw biological material into a marketable product that can be sold for profit.  (Aplt. App. at 38).

The services that plasma donation centers thus provide to their customers – services that require medical and scientific expertise – are comparable to services offered by certain "health care provider[s]," which are entities specifically named in 42 U.S.C. § 12181(7)(F) (Add. at 4).  Although the district court rejected the analogy (Aplt. App. at 40), the services provided by both types of entities are similar.  Octapharma employs medical professionals to supervise or conduct examinations and blood extractions. Donors are screened and their blood is tested and processed in a manner consistent with activities that take place at a doctor's office.  Several federal laws and regulations support the analogy, indicating that blood centers and plasma donation centers can be viewed as healthcare providers.  *See* Health Insurance Portability and Accountability Act, 42 U.S.C. § 300jj(3) (Add. at 15) (stating that the term "health care provider" includes blood centers); Omnibus Budget Reconciliation Act of 1990, 42 U.S.C. § 1320b-5(g)(2) (Add. at 12) (broadly defining "health care provider"); Social Security Act, 42 U.S.C. § 1395x(s)(2)(A) (Add. at 14) (defining "medical and other health services").  The point is

not that Octapharma is a health care provider; the point is that the service it provides is, at the very least, comparable.

    2.   The Exchange Between Plasma Donation Center And Donor Is Similar To The Business-Customer Relationship At Other Covered Entities And Does Not Remove The Center From Title III's Coverage

Rather than looking at the actual service that Octapharma provides, the district court fixated on the fact that Octapharma pays money to the customer rather than vice versa. It concluded that the nature of the transaction "creates a fundamental difference between plasma donation centers and the other establishments listed" (Aplt. App. at 38). Neither Title III's text nor its broad remedial purpose support this distinction between business models where the customer pays cash and ones where the customer receives it. The direction in which cash payments flow should not obscure the fact that a plasma donation center engages in a quid-pro-quo with its customers that enables it to turn a profit by providing its services.[9]

In exchange for the donation center's services and a fee, the donor allows the center to sell his now-market-ready source plasma to a pharmaceutical company and to retain any profits earned from that sale. Ultimately, therefore, the donation center provides its screening and extraction services in exchange for rights to the monetary

---

[9] It is far from obvious that an entity must receive *any* compensation from customers in order to be a "service provider." For example, law offices are service establishments that are specifically listed in the statute and will be familiar to this Court. As this Court is aware, some lawyers perform services in exchange for cash payments; others work on contingency, keeping a portion of the proceeds they realize for their clients; and still others perform legal service entirely without compensation from their clients (either working *pro bono* or being compensated by another source). It is unclear why these details should affect whether their offices are subject to Title III's requirements.

value of the donor's source plasma. Thus, even if there were any basis for the district court's arbitrary rule that "service establishments" must receive compensation from their customers – and there is not – such a rule still would not exclude plasma donation centers. While a donation center receives compensation from the donor in a different form than the cash payment that many service providers receive from their customers, it is compensation all the same.[10]

Indeed, the interaction between donor and donation center bears striking similarity to other commercial relationships in which a business, rather than selling an item to a customer, facilitates a customer's ability to realize or enhance the monetary value of an item he or she already owns. Pawn shops, for example, facilitate customer exchanges of tangible items in return for money. When an individual enters a pawn shop seeking to trade his watch for a cash payment, the shop enables the transaction, appraising the item and allowing the customer to derive immediate monetary value from the trade. The shop offers the customer a fee for the watch, prepares it for resale, and then resells it on the open market for a greater amount. Similarly, a store specializing in used records, used DVDs, or vintage clothing allows the customer to transform items he or she no longer wants into quick cash.

Under the district court's reasoning, none of these establishments would be "sales establishments" covered by 42 U.S.C. § 12181(7)(E) (Add. at 4). Each of the specified

---

[10] One survey of the industry found that "a single plasma donation, for which a donor might be paid $30, results in pharmaceutical products worth at least $300." Andrew Pollack, *Is Money Tainting The Plasma Supply*, N.Y. Times, Dec. 5, 2009, *available at* http://www.nytimes.com/2009/12/06/business/06plasma.html?pagewanted=all&_r=0.

examples in the "sales establishment" subsection, including bakeries and hardware stores, are establishments where customers receive goods in exchange for the payment of money. Their business model thus differs from that of establishments such as pawn shops, where, in many instances, the customer receives money from the shop. But there is no reason why these details as to payments should affect Title III coverage, which is meant to extend to all entities that affect commerce and are open to the public. *See* 42 U.S.C. § 12181(7) (Add. at 4-5) (defining "public accommodations" in terms of whether "such entities affect commerce").

   3.   The Nature Of The Exchange Is Ultimately Irrelevant to Title III's Coverage

Reasoning such as the district court employed here would necessarily frustrate Title III's mandate by excluding a wide array of businesses and facilities from its scope, simply because of variations in their business models. Even if the financial transaction between a plasma donation center and its customers were completely unique – and it is not – there is no reason why that should affect the analysis.

The Supreme Court rejected the attempt to draw a similarly arbitrary distinction in *Martin*, a case in which the PGA Tour argued that a professional golfer could not assert Title III rights to access a golf tournament. The PGA Tour contended that Title III protected only the rights of "clients or customers," a group that it asserted did not include tournament participants. *See PGA Tour Inc.*, 532 U.S. at 678. The Supreme Court found it unnecessary to decide whether Title III protects more than "clients or customers," because even assuming such a limitation, a tournament participant was as much a "client

or customer" as was a spectator. The tournament was publicly open to participants, albeit only those who satisfied certain requirements. And the tournament offered "privileges," *see* 42 U.S.C. § 12182(b)(1)(A)(i) (Add. at 6), to both spectators and participants, thus triggering Title III's coverage; it was immaterial that the tournament offered the two groups different privileges. The Court concluded that it would be "inconsistent with the literal text of the statute as well as its expansive purpose to read Title III's coverage, even given [the PGA Tour's] suggested limitation, any less broadly." *PGA Tour Inc.*, 532 U.S. at 680.

That analysis applies readily here. Whether a customer pays or gets paid has no bearing on whether a plasma donation center offers the sort of "goods, services, facilities, privileges, advantages, or accommodations" to the public that is the hallmark of a public accommodation. *See* 42 U.S.C. § 12182(b)(1)(A)(i) (Add. at 6).

For these reasons, many courts correctly have rejected the notion that other details as to the manner of the exchange between business and customer have any bearing on Title III's applicability, so long as the business at issue is open to the public. For example, courts have held that the ADA's public accommodations provision is "not limited to actual physical structures" and extends to services and goods sold by phone or mail. *Carparts Distrib. Ctr., Inc.*, 37 F.3d at 19-20; *accord Pallozzi v. Allstate Life Ins. Co.*, 198 F.3d 28, 32 (2d Cir. 1999); *cf. Stevens v. Premier Cruises, Inc.*, 215 F.3d 1237, 1241 (11th Cir. 2000) ("[B]oth the Supreme Court and this Court have concluded previously that the ADA is applicable to contexts that may not have been particularly envisioned by Congress."). They have concluded that Title III's broad language and

24

purpose require extending its protections to website-only businesses, to ensure that individuals with disabilities can fully participate in today's public life.  *See Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir. 1999); *Nat'l Fed. of the Blind*, No. 14-162, 2015 WL 1263336 (D. Vt. Mar. 19, 2015); *but see Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000) (holding that Title III applies only to "actual, physical spaces").  Of course, this Court need not reach any conclusion as to whether Title III applies beyond brick-and-mortar structures.  It need only find that physical transfer of money from customer to merchant is not required to make a business a "service establishment."[11]

* * * *

The district court's opinion incorrectly carves out an exception from the coverage of the ADA, a statute that Congress purposefully designed to sweep broadly in order to ensure the full integration into society of individuals with disabilities.  Congress defined the "public accommodations" covered by Title III using expansive terms such as "service establishment," and it meant those terms to capture virtually every commercial establishment open to the public, including the blood donation bank at issue here.

---

[11] An unpublished district court case, *Maley v. Octapharma Plasma, Inc.*, held that "[a] plasma donation center is not listed as a covered entity and does not provide a 'service' to the public."  No. 12-13892, 2013 WL 3814248, at *4 (E.D. Mich. July 22, 2013).  This finding, however, was wholly conclusory and not supported by any legal analysis or discussion whatsoever.  The decision – rendered in a case brought by a *pro se* plaintiff – is unpersuasive and should have no bearing upon this Court's analysis.

Because the district court's conclusions are inconsistent with Title III's language,

purpose, and history, this Court should reverse.

## CONCLUSION

This Court should reverse the district court's dismissal of the complaint and

remand for further proceedings.

Respectfully submitted,

s/ Sasha Samberg-Champion
Sasha Samberg-Champion
Michael Allen
Ryan C. Downer
RELMAN, DANE & COLFAX PLLC
1225 19th Street, N.W. Suite 600
Washington, D.C. 20036
(202) 728-1888
(202) 728-0848 (fax)

Aaron M. Kinikini
Disability Law Center
205 North 400 West
Salt Lake City, Utah 84103
(801) 869-2708
(801) 363-1437 (fax)

*Attorneys for Plaintiff-Appellant*

**STATEMENT REGARDING ORAL ARGUMENT**

Because of the importance of the issues involved, Appellant Brent Levorsen respectfully submits that oral argument is appropriate.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I hereby certify that this brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.  This brief contains 7,093 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I further certify that this brief complies with the typeface and type style requirements of Rule 32(a)(5)-(6) of the Federal Rules of Appellate Procedure.  The brief has been prepared in proportionally spaced typeface using Microsoft Word 2013 in 13-point Times New Roman for the main text and footnotes.

<u>s/ Sasha Samberg-Champion</u>
Sasha Samberg-Champion

Date: April 27, 2015

## CERTIFICATE OF DIGITAL SUBMISSION

I certify that the electronic version of the foregoing BRIEF OF PLAINTIFF-

APPELLANT BRENT LEVORSEN, prepared for submission via ECF, complies with all

required privacy redactions per Tenth Circuit Rule 25.5, is an exact copy of the paper

copies submitted to the Tenth Circuit Court of Appeals, and has been scanned with

Symantec Endpoint Protection and is virus-free.

<u>s/ Sasha Samberg-Champion</u>
Sasha Samberg-Champion

Date: April 27, 2015

**CERTIFICATE OF SERVICE**

I hereby certify on April 27, 2015, I electronically filed the foregoing BRIEF OF PLAINTIFF-APPELLANT BRENT LEVORSEN with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

In addition, I certify that on April 27, 2015, I served seven paper copies of the same by Federal Express to the Court.

s/ Sasha Samberg-Champion
Sasha Samberg-Champion