ORAL ARGUMENT REQUESTED
_____

Case. No. 14-4162
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT
_____

BRENT LEVORSEN,

Plaintiff- Appellant

v.

OCTAPHARMA PLASMA, INC.,

Defendant-Appellee
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, NO. 2:14-CV-00325
THE HONORABLE DUSTIN B. PEAD
_____

BRIEF FOR THE
PLASMA PROTEIN THERAPEUTICS ASSOCIATION
AS *AMICUS CURIAE* IN SUPPORT OF OCTAPHARMA PLASMA, INC.
AND URGING AFFIRMANCE
_____

JOHN T. DELACOURT
JOSHUA PENROD
Plasma Protein Therapeutics Association
3050 K Street, NW
Suite 400
Washington, DC  20007
(202) 789-3100

JOSEPH A. BOYLE
Kelley Drye & Warren LLP
One Jefferson Road
2nd Floor
Parsippany, NJ  07054
(973) 503-5920

## CORPORATE DISCLOSURE STATEMENT

The Plasma Protein Therapeutics Association is a nonprofit corporation organized under the laws of the District of Columbia.  It has no parent company and has issued no stock.

## DISCLOSURE STATEMENT OF *AMICUS CURIAE*

The Plasma Protein Therapeutics Association declares, pursuant to Fed. R. App. P. Rule 29(c)(5), that neither any party's counsel, nor any person other than PPTA, authored this brief, in whole or in part, or contributed money that was intended to fund the preparation or submission of this brief.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT……………………………………………i

DISLCOSURE STATEMENT OF *AMICUS CURIAE*………………………..……….ii

TABLE OF CONTENTS…………………………………………………………...iii

TABLE OF AUTHORITIES……………………………………………………...v

INTRODUCTION…………………………………………………………………...1

INTEREST OF *AMICUS CURIAE*………………………………………………...1

STATEMENT OF THE CASE……………………………………………………...2

ARGUMENT………………………………………………………………………….5

I.      Pursuant To The Plain Meaning Of Title III Of The ADA, A Plasma Collection Center Is Not A "Place Of Public Accommodation"…………………………...5

        A.      A Plasma Collection Center Is Not A "Service Establishment"…………...5

                1.      The Scope Of Title III, On "Places Of Public Accommodation," Is Limited By Its Intent……………………………………………..……5

                2.      The Scope Of Subsection (F), On "Service Establishments," Is Limited By The Specific Examples Provided……………………...7

        B.      A Contrary Holding Would Render Other Provisions Of The ADA Superfluous…………………………………………………………..10

        C.      A Plasma Collection Center Is Not A "Health Care Provider"………......12

II.     Declaring A Plasma Collection Center To Be A "Place of Public Accommodation" Would Frustrate Existing FDA And PPTA Frameworks For Protecting The Safety Of Both Donors And Products……………………………………………13

        A.      FDA's Regulations Under The Public Health Service Act…………......13

        B.      PPTA's Voluntary Standards…………………………………………...16

CONCLUSION………………………………………………………………………..18

STATEMENT REGARDING ORAL ARGUMENT………………………..……...19

CERTIFICATE OF COMPLIANCE…………………………………………….…20

CERTIFICATE OF DIGITAL SUBMISSION…………………………………….21

CERTIFICATE OF SERVICE…………………………………………….………22

# TABLE OF AUTHORITIES

## CASES

*Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555 (1999)…………………………………..16

*Bridger Coal Co./Pac. Minerals, Inc. v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 927 F.2d 1150 (10th Cir. 1991)……………………………….…..……11

*Maley v. Octapharma Plasma, Inc*., No. 12-13892, 2013 WL 3814248 (E.D. Mich. July 22, 2013)……………………………………………………………………………....9

*PGA Tour, Inc. v. Martin*, 532 U.S. 661 (2001)……………………….……….6, 9, 11, 12

*Steger v. Franco, Inc*., 228 F.3d 889 (8th Cir. 2000)…………………………..……….5

*Toomer v. City Cab*, 443 F.3d 1191 (10th Cir. 2006)…………………………………..8

*United States v. Brune*, 767 F.3d 1009 (10th Cir. 2014)…………………………………..8

## FEDERAL STATUTES AND REGULATIONS

21 C.F.R. § 640.31(b)……………………………………....………14

21 C.F.R. §§ 640.60-640.76……………………………………………....3

21 C.F.R. § 640.63(a)……………………………………………....14

21 C.F.R. § 640.63(c)………………………………………....14

21 C.F.R. § 640.63(d)………………………………………....15

21 C.F.R. § 640.63(g)…………………………………………....4

60 Fed. Reg. 82,574……………………………………….................12

42 U.S.C. § 262(a), (i), and (k)(8)………………………………………14

42 U.S.C. § 12181(7)(F)…………………………………………7
.
42 U.S.C. § 12182(a)………………………………………………....6

# OTHER AUTHORITIES

Guidance for Industry: Implementation of Acceptable Full-Length and Abbreviated Donor History Questionnaires and Accompany Materials for Use in Screening Donors of Source Plasma, 2013 WL 989952 (Food & Drug Admin., Feb. 2013)…………………15

The Mayo Clinic, *Diseases and Conditions: Schizophrenia*, http://www.mayoclinic.org/diseases-conditions/schizophrenia/basics/definition/con-20021077...........................................................................................................4

PPTA, *International Plasma Awareness Week Brochure* (2014), http://www.pptaglobal.org/images/ipaw/2014/Infographics/PDF_FILES/SAVE_LIVES_US_11x17_FINAL_CROPBLEED.pdf......................................................2, 3

PPTA, *International Quality Plasma Program*, http://www.pptaglobal.org/safety-quality/standards/iqpp…………………………………………………………………3

PPTA, *IQPP Cross Donation Management Standard* (2014), http://www.pptaglobal.org/images/IQPP/CDMSFinal.pdf…………………………………………………......16

PPTA, *Overview of Plasma Protein Therapies*, http://www.pptaglobal.org/plasma-protein-therapies/therapies.........................................................................................2

PPTA, *PPTA Donor History Questionnaire*, http://www.pptaglobal.org/safety-quality/donor-history-questionnaire.................................................................................4

PPTA, *Use of the National Donor Deferral Registry Standard* (2008) http://www.pptaglobal.org/images/IQPP_NDDR_V3_0.pdf……....................................17

U.S. Dep't of Justice, *ADA Title III Technical Assistance Manual Covering Public Accommodations and Commercial Facilities* (1993), http://www.ada.gov/taman3.html.........................................................................8

## INTRODUCTION

This case is about something simple that Appellant strives mightily to make seem complicated.  Title III of the Americans with Disabilities Act ("ADA") actually defines the term "place of public accommodation" with great precision.  The definition has 12 different subsections and employs no fewer than 54 illustrative examples.  Plasma collection centers are not mentioned.  With no other option available, Appellant argues that a plasma collection center is a "service establishment" – analogous to a dry-cleaner or a barber shop – despite the fact that it is the plasma donor, and not the collection center, that provides the service.  The District Court correctly concluded that this interpretation is directly at odds with the 15 examples of "service establishments" provided in the statute and, for that reason, should be affirmed.

## INTEREST OF *AMICUS CURIAE*

The Plasma Protein Therapeutics Association ("PPTA") is the global representative of both operators of source plasma collection centers and manufacturers of plasma protein therapies.  On the collection side, PPTA's member companies are responsible for operating more than 500 plasma collection centers throughout the United States and Europe.  On the manufacturing side, PPTA's member companies produce approximately 80% of the plasma protein therapies used in the United States and nearly 60% of the therapies used in Europe.  In addition to its role as an industry advocate, PPTA develops industry-wide voluntary standards and monitors compliance with these standards through a network of independent, third party auditors.  Most relevant to this

1

case is the standards program applicable to plasma collection centers – the International Quality Plasma Program ("IQPP"). IQPP standards have multiple objectives, but chief among them are: (1) protecting the safety of the plasma donor; and (2) protecting the safety of the collected source plasma, which will ultimately be used to manufacture biological therapies for human use. PPTA consequently has a direct interest in ensuring that the ADA is not interpreted in a manner that will impede these objectives, including by compromising the science-based donor screening process.

All parties have consented to PPTA's filing of this brief as *amicus curiae*.

## STATEMENT OF THE CASE

For some period of years, Appellant Brent Levorsen regularly donated source plasma. For each one of these donations he received compensation, totaling about $260 per month. Aplt. App. at 8 ¶ 11; 10 ¶ 21. Plasma provided by human donors is the "source" material from which plasma protein therapies are manufactured. Plasma protein therapies are life-saving biological drug products used to treat a variety of rare, chronic conditions, including primary immunodeficiency ("PID") and hemophilia.[1] Manufacturing sufficient product to treat a single PID patient for one year requires nearly 130 donations.[2] Treating a single hemophilia patient for one year requires nearly 1200

---

[1] *See* PPTA, *Overview of Plasma Protein Therapies*, http://www.pptaglobal.org/plasma-protein-therapies/therapies (last visited June 18, 2015).

[2] PPTA, *International Plasma Awareness Week Brochure* (2014), http://www.pptaglobal.org/images/ipaw/2014/Infographics/PDF_FILES/SAVE_LIVES_US_11x17_FINAL_CROPBLEED.pdf.

donations.[3]  Consequently, collecting sufficient source plasma to meet patient need

requires dedicated, volunteer donors who are willing to donate as frequently as multiple

times per month and up to twice per week.  Because each donation can take an hour or

more, these donors often receive compensation, including cash compensation, for their

time and inconvenience.

Before Mr. Levorsen was permitted to donate plasma, collection center personnel

asked him a series of questions about his health history and conducted a physical

examination.  Aplt. App. at 8 ¶ 13.  Not every member of the general public that wishes

to donate plasma is permitted to do so.  Although the desire to help the chronically ill

through the donation of source plasma is an altruistic impulse that should be commended,

some would-be donors, through no fault of their own, cannot satisfy the science-based

donor eligibility criteria.  These detailed criteria are set forth in both Food and Drug

Administration ("FDA") regulations[4] and PPTA voluntary standards.[5]  Because donor

screening is a critical component of the overall framework for ensuring the safety of

plasma protein therapies, these criteria have been give careful consideration.  Indeed, the

PPTA Donor History Questionnaire ("DHQ"), used at plasma collection centers

throughout the country, represents nearly a decade of collaborative work between PPTA,

---

[3] *Id.*

[4] *See* 21 C.F.R. §§ 640.60-640.76 (standards for the collection of plasma and for donor eligibility).

[5] *See* PPTA, *International Quality Plasma Program* (standards on donor management and donor health), http://www.pptaglobal.org/safety-quality/standards/iqpp (last visited June 18, 2015).

FDA, and the American Association of Blood Banks.[6]  The DHQ includes questions ranging from the seemingly nosy (tattoos and piercings) to the downright intrusive (sexual conduct) not to discriminate against donors, but to identify important risk factors. Identifying these factors is an essential step not only in protecting the patients who rely on plasma protein therapies, but in protecting the donors themselves.

In May 2013, during the donor screening process, Mr. Levorsen disclosed certain medications that he was taking.  When asked why he was taking those medications, Mr. Levorsen stated that he had been diagnosed with borderline schizophrenia.  Aplt. App. at 9 ¶¶ 14-15.  Based on this information, center personnel informed him that he would not be permitted to donate.  Aplt. App. at 9 ¶ 16.  As noted previously, screening questions are used to identify risk factors and it is not unusual for would-be plasma donors to be turned away for health-related reasons.  FDA regulations confirm that, because the DHQ plays a central role in donor eligibility determinations, it is critical that a donor be able to respond to the questions accurately and reliably.[7]  "Schizophrenia" is defined as a mental disability that "may result in some combination of hallucinations, delusions, and extremely disordered thinking and behavior."[8]  Consequently, although individuals with this disability may be able to lead normal lives in many respects, the facts remains that

---

[6] PPTA, *PPTA Donor History Questionnaire*, http://www.pptaglobal.org/safety-quality/donor-history-questionnaire (last visited June 18, 2015).

[7] 21 C.F.R. § 640.63(g).

[8] The Mayo Clinic, *Diseases and Conditions: Schizophrenia*, http://www.mayoclinic.org/diseases-conditions/schizophrenia/basics/definition/con-20021077 (last visited June 18, 2015).

they are at an elevated risk for not being able to answer health-related questions accurately and reliably.

Mr. Levorsen subsequently filed suit alleging that the decision to prohibit him from donating plasma, based on the donor eligibility criteria developed by FDA and PPTA, constituted unlawful discrimination under the ADA.  The District Court subsequently dismissed the claim on the grounds that a plasma collection center is part of a manufacturing process, not a "service establishment," and therefore does not constitute a "place of public accommodation."  Aplt. App. at 37-38.

## ARGUMENT

I.    **Pursuant To The Plain Meaning Of Title III Of The ADA, A Plasma Collection Center Is Not A "Place of Public Accommodation"**

A.    **A Plasma Collection Center Is Not A "Service Establishment"**

Appellant and the Department of Justice ("DOJ") argue that, because Congress intended the ADA to be construed broadly, the Court should ignore the multiple subsections and illustrative examples that define the scope of a "place of public accommodation."  This approach would be contrary to both generally applicable canons of statutory construction and specific ADA case law.

1.    **The Scope Of Title III, On "Places of Public Accommodation," Is Limited By Its Intent**

PPTA does not dispute that the ADA, as remedial legislation, should be interpreted broadly.  *See Steger v. Franco, Inc*., 228 F.3d 889, 894 (8th Cir. 2000).  Nor does the Association dispute that the specific provision on "public accommodations," Title III, should be "construed liberally to afford people with disabilities equal access to

5

the wide variety of establishments available to the non-disabled." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 662 (2001). Asserting that a provision should be "construed liberally," however, is not the same thing as saying that its well defined limits should be ignored.

One fundamental limit on the scope of Title III is its intent. Title III states that:

> [n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.[9]

Appellant and DOJ assert that a plasma collection center is a "service establishment," and "services" are specifically mentioned in this provision. As the text of the statute makes clear, the intent of the provision on "public accommodations" is to ensure that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of . . . services." It is a fundamental point, but it is worth re-stating: the purpose of the provision is to ensure that *the disabled individual*, not some other group of society at large, enjoys the service at issue on a "full and equal" basis.

Both Appellant and DOJ identify a "service" provided by a plasma collection center, but both struggle, and ultimately fail to identify a service provided *to the disabled individual* (*i.e.*, the plasma donor). Appellant asserts that a plasma center provides two services: (1) screening the donor's blood, and (2) extracting and processing the donor's plasma. Appellant's Brief at 20. The beneficiary of both of these services, however, is the patient, not the donor. Extracting and processing the donor's plasma facilitates the

---

[9] 42 U.S.C. § 12182(a).

manufacture of drug products to treat the patient's illness, while screening the donor's blood ensures that the drug products the patient receives are safe and pathogen-free.

DOJ defines the service provided by a plasma center in more industrial terms, as "plasma procurement" (DOJ's Brief at 6), but this definition suffers from the same flaw. Like the services identified by Appellant, "plasma procurement" benefits the patient, by providing the raw material needed to manufacture drug products necessary to ensure the patient's continued good health.  "Plasma procurement" also arguably benefits the manufacturer, by providing the raw material needed to produce medicines for sale in the commercial marketplace.  In either scenario, plasma donors are the providers of the service, not the recipients, and cannot be deprived of "full and equal" enjoyment of services not intended for them in the first place.

## 2.    The Scope Of Subsection (F), On "Service Establishments," Is Limited By The Specific Examples Provided

Another important limitation on the definition of "service establishment" is the specific examples of "service establishments" provided in the statute.  Subsection (F) of Title III provides no fewer than 15 such examples, and states specifically that covered "places of public accommodation" include:

> a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment.[10]

---

[10] 42 U.S.C. § 12181(7)(F).

Appellant argues that the District Court erred by requiring that other covered "service establishments" be similar to the listed examples (Appellant's Brief at 14), and DOJ states flat out that "the listed examples do not constrict the 'service establishment' category" (DOJ's Brief at 18), but this is simply incorrect.  As a starting point, undesired or inconvenient terms in a statute cannot simply be ignored.  *Toomer v. City Cab*, 443 F.3d 1191, 1194 (10th Cir. 2006) (statutory construction requires "giv[ing] effect, if possible, to every clause and word").  Furthermore, the general canon of statutory construction *ejusdem generis* – "of the same kind" – holds that general terms in the same list or provision should be interpreted in conformity with specific examples provided.  *United States v. Brune*, 767 F.3d 1009, 1023 (10th Cir. 2014) (noting that when "general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the specific words").  Even DOJ's own guidance acknowledges that, rather than being purely superfluous, the examples provided in Title III are for illustrative purposes.[11]

There are many commonalities among the 15 listed examples, but one is the most conspicuous.  In every single one of the examples – 15 out of 15 – those making use of the "service establishment" pay for the service provided.  The exchange of money is a strong indicator of both who is providing, and who is receiving, the service.  Not surprisingly, the two courts to address the issue directly have concluded that because

---

[11] U.S. Dep't of Justice, *ADA Title III Technical Assistance Manual Covering Public Accommodations and Commercial Facilities* (1993), http://www.ada.gov/taman3.html.

plasma centers pay donors, and not the reverse, they do not qualify as "service establishments" for ADA purposes.  As the District Court explained:

> A plasma donation center is distinguishable.  Unlike the other service establishments explicitly listed, a plasma donation center does not offer goods or services in exchange for compensation.  To the contrary, it is the plasma donation center that offers money to a member of the public in exchange for a service to the center – the donation of plasma.

Aplt. App. at 37.  *See also Maley v. Octapharma Plasma, Inc*., No. 12-13892, 2013 WL 3814248, at *4 (E.D. Mich. July 22, 2013) ("A plasma donation center is not listed as a covered entity and does not provide a 'service' to the public.  Rather, the donation center accepts blood from members of the public and pays them for donating, *i.e*. pays them for their service.").

Appellant asserts that the District Court erred by attributing such significance to the exchange of money in light of the fact that the Supreme Court declined to decide whether Title III protects only the rights of "clients and customers."  *See PGA Tour*, 532 U.S. at 678-79.  Setting aside the fact that, even by this argument's own terms, the District Court was operating within the discretion granted it by the Supreme Court, its ruling did not go nearly that far.  Far from deciding that payment for a service is dispositive of whether any entity constitutes a "place of public accommodation" under Title III, the District Court concluded only that it is dispositive of whether an entity constitutes a "service establishment" for purposes of subsection (F).  The appropriate treatment of golf courses, like the one at issue in *PGA Tour*, and entities covered by Title III's other 11 subsections remains for another day.

Appellant and DOJ also attempt to counter the District Court's focus on payment by providing examples of other "service establishments" that, like plasma centers, pay purported users of the service.  Appellant offers the example of a pawn shop, as well as stores specializing in used records, DVDs, and vintage clothing (Appellant's Brief at 22), but these entities are really "sales establishments."  They are addressed under a separate Title III subsection – subsection (L).  The fact that they also acquire some merchandise from their customer base does not change their inherent nature.  DOJ offers the example of a recycling center (DOJ's Brief at 23), but this example suffers from a similar flaw. Any payment at issue relates to the exchange of goods, not the provision of a service. The fact that the seller may consider the goods of little or no value, and literally regards them as trash, does not change the inherent nature of the transaction.

## B.    A Contrary Holding Would Render Other Provisions Of The ADA Superfluous

By chipping away at the two key limitations on the ADA's definition of "service establishment" – the intent of Title III and the specific examples provided in subsection (F) – Appellant and DOJ move away from a common sense definition, like "an establishment that provides a service to a disabled individual," to something more wide open like "an establishment that provides a service to anyone (not necessarily the complainant)" or "an establishment where a service happens."  Adopting this approach, Appellant concludes that "a natural reading of the term 'service establishment' plainly includes any facility, open to the public, where commercial exchange involving an intangible benefit is conducted."  Appellant's Brief at 13.  Using similar reasoning, DOJ

10

concludes that a plasma collection center provides "plasma procurement services." DOJ's Brief at 6.

By applying this approach in other contexts, one can clearly see that it would lead to absurd results. Arguing that a plasma collection center provides "plasma procurement services" is a bit like arguing that a coal mine provides "coal procurement services" and a cattle ranch provides "beef procurement services," yet no reasonable person would argue that the latter two are either "service establishments" or "places of public accommodation." Indeed, the structure of the ADA itself accounts for such a diversity of establishments by providing multiple titles, rather than requiring litigants to shoehorn every conceivable entity into Title III. Most notably, it provides Title I, which covers places of employment (*i.e*., places like coal mines and cattle ranches).

Because the definitions of "service establishment" offered by Appellant and DOJ blur the lines between Title I and Title III, they should be rejected. A contrary approach would violate fundamental principles of statutory construction. *See Bridger Coal Co./Pac. Minerals, Inc. v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 927 F.2d 1150, 1153 (10th Cir. 1991) ("We will not construe a statute in a way that renders words or phrases meaningless, redundant, or superfluous."). It would also involve falling into a trap analogous to the one the Supreme Court warned against in *PGA Tour*. There the court cautioned that invoking the "sweeping" and "expansive" purposes of the ADA could lead to overly broad interpretations of the rights and privileges protected by Title III, pursuant to which "the employees and independent contractors of every place of public accommodation come within Title III" because "[t]he employee

11

enjoys the 'privilege' of the employment and the contractor the 'privilege' of the contract." *PGA Tour*, 532 U.S. at 692 (Scalia, J., dissenting).  Appellant and DOJ invite the Court to accomplish the same result through their interpretations of "service establishment," pursuant to which every entity whose purpose or function can be conceived of as a "service" (*e.g.*, a church provides "spiritual development service," a private club provides "exclusive socialization service") becomes a "place of public accommodation."

### C.    A Plasma Collection Center Is Not A "Health Care Provider"

On appeal, Appellant appears to have abandoned the argument that a plasma collection center is a "health care provider" – one of the examples of a "service establishment" specifically listed in subsection (F).   Doubtlessly this is because the Department of Health and Human Services ("HHS") implementing regulations for the Health Insurance Portability and Accountability Act ("HIPAA") expressly state that a plasma center is *not* a health care provider.  Nevertheless, a brief review of the HIPAA-related discussion of plasma centers is warranted.

In the summary of comments on the implementing regulation, HHS notes that "[s]ome commenters suggested that blood centers and plasma donor centers that collect and distribute source plasma should not be considered health care providers because the centers do not provide 'health care' services and the blood donors are not 'patients' seeking health care."  Standard for Privacy of Individually Identifiable Health Information, 60 Fed. Reg. 82,574 (Dec. 28, 2000).  In response, HHS states unequivocally that "[w]e agree" and "have deleted from the definition of 'health care' the

term 'procurement or banking of blood, sperm, organs, or any other tissue for administration to patients.'" *Id.*

This brief exchange clarifies two points. First, HHS makes clear that "plasma procurement service" – the precise characterization of the "service" provided by plasma collection centers offered by DOJ – is not a service being provided to plasma donors, who are not patients. Second, although Appellant notes with alarm that the District Court's reasoning would exclude from coverage under Title III not only plasma collection centers but facilities for "sperm donation, egg donation, bone marrow donation and stem cell donation" (Appellant's Brief at 15), HHS appears to be completely comfortable with this result. Indeed, the fact that HHS, when asked only about blood and plasma centers in the context of the HIPAA discussion, extended its reasoning, *sua sponte*, to the donation of "sperm, organs, or any other tissue," demonstrates that it expressly contemplated that all facilities for the donation of human tissue would be considered similarly (*i.e.*, as non-service providers).

## II. Declaring A Plasma Collection Center To Be A "Place Of Public Accommodation" Would Frustrate Existing FDA And PPTA Frameworks For Protecting The Safety Of Both Donors And Products

### A. FDA's Regulations Under The Public Health Service Act

Declaring plasma collection centers to be "places of public accommodation" is fundamentally inconsistent with FDA regulations that require such centers to limit access. DOJ worries that, if the District Court's decision is allowed to stand, plasma centers will be "perfectly free to say 'Sorry, we don't serve people who have disabilities.'" DOJ's Brief at 8. Setting the negative gloss aside, however, this is fairly close to what the law

13

requires.  Plasma collection centers are governed by the Public Health Service Act ("PHSA"), *see* 42 U.S.C. § 262(a), (i), and (k)(8), which requires them to rigorously evaluate donor eligibility from the perspective of both donor and product safety. Consequently, while plasma centers may not make the blanket statement "we don't serve people who have disabilities," they *must* make the statement "we don't serve people who have disabilities that may prevent them from donating safely."

Pursuant to FDA regulations under the PHSA, plasma donors "shall meet the criteria for donor suitability."  21 C.F.R. § 640.31(b).  The donor's suitability shall be determined on the day of collection "by means of a medical history, tests, and such physical examination as appears necessary."  21 C.F.R. § 640.63(a).  The regulations specify that a donor's suitability shall be determined, in part, by an assessment of such physical criteria as the individual's temperature, blood pressure, hemoglobin level, weight, and "freedom from disease."  21 C.F.R. § 640.63(c).  As one would expect, in order for any of this to take place, "[i]nformed consent shall be required."  21 C.F.R. § 640.31(b).

The medical history component of this donor eligibility assessment is critical, and has received significant attention from PPTA.  Working with other industry stakeholders, PPTA has developed a detailed Donor History Questionnaire for use in comprehensively assessing donor risk factors.  Indeed, the DHQ has received FDA approval,[12] and is now

---

[12] *See* Guidance for Industry: Implementation of Acceptable Full-Length and Abbreviated Donor History Questionnaires and Accompany Materials for Use in Screening Donors of Source Plasma, 2013 WL 989952 (Food & Drug Admin., Feb. 2013).

14

in use throughout the industry.  Establishing a complete and accurate medical history for each and every donor, though use of the DHQ and other tools, is a core component of the overall framework for protecting both donor and patient (*i.e*., the user of the product), and necessarily requires the full cooperation of the donor.  Consequently, FDA regulations specify that "[a]ny donor who . . . for any reason does not appear to be providing reliable answers to medical history questions shall not be considered a suitable donor."  21 C.F.R. § 640.63(d).

With this background in mind, and all due respect to Mr. Levorsen, whose willingness to donate plasma is to be commended, the fact that his physical examination revealed no blood borne contagion or other problem with the quality of his plasma does not completely resolve the donor eligibility issue.  Both the medical history and informed consent components of the donor screening process require the interviewer to have confidence in the reliability of the donor's answers, and disclosure of Mr. Levorsen's disability – borderline schizophrenia – put that confidence in doubt.  Deferring him from donating was therefore not only appropriate but the plasma collection center's legal obligation.  This conclusion creates a conflict between the ADA and the applicable FDA regulations, but there are clear rules in place for resolving this conflict.  At the Supreme Court has stated, "[w]hen Congress enacted the ADA, it recognized that federal safety rules would limit application of the ADA as a matter of law."  *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 573 (1999).

### B.    PPTA's Voluntary Standards

In addition to the DHQ, PPTA and the industry have made other significant investments in ensuring the accuracy and reliability of the donor screening process. The Association has worked with its members to continuously revise and update its voluntary standard programs to reflect the state-of-the-art in risk assessment.  Of particular importance to the current controversy, as one component of these efforts PPTA has developed and implemented a pair of industry databases that serve to verify critical elements of a donor's medical history.

The first, which is intended to protect donor health, is the Cross Donation Check System ("CDCS").[13]  Plasma, like blood, is a renewable tissue, but the body needs time to replace the plasma volume lost through donation.  Consequently, FDA has established limits on the frequency of donation.  A second donation in less than 48 hours or a third in fewer than 7 days would violate these limits, and is considered a "cross donation." Experience demonstrates that, for whatever reason – forgetfulness, misunderstanding of the time limits, etc. – some donors may attempt to donate more frequently than is recommended, thereby potentially endangering their health.  Because this is most likely to happen when a donor visits more than one collection center, the CDCS was implemented to bridge the information gap, and provides information on an individual's donations nationwide.  A CDCS check is run each time an individual attempts to donate, and notifies the center immediately if the FDA limits have been exceeded.

---

[13] *See* PPTA, *IQPP Cross Donation Management Standard* (2014) http://www.pptaglobal.org/images/IQPP/CDMSFinal.pdf.

The second, which is intended to protect product safety, is the National Donor

Deferral Registry ("NDDR").[14]  Because plasma protein therapies are manufactured from

a pool of many individual plasma donations, the impact of even a single contaminated

donation could be dramatic.  One of the multiple safety precautions in place to prevent

this is the NDDR – a confidential, nationwide database of plasma donors who have tested

positive for HIV, Hepatitis B, or Hepatitis C.[15]  Each time an individual attempts to

donate, an NDDR check is run.  If the NDDR returns a positive result, the individual is

deferred from donating.

The point in describing these databases is not to suggest that, because robust

verification procedures are in place, accurate and reliable responses to donor screening

questions are no longer important.  In fact, it is just the opposite.  The reason PPTA, its

member companies, and individual plasma centers have made such significant

investments in the CDCS and the NDDR is that assessing a donor's medical history

remains central to industry's efforts to protect both donor and patient safety.  Although

the CDCS and the NDDR function as a backstop to two specific questions out of many,

they are no substitute for accurate and reliable donor responses to the entire DHQ.  Given

the importance of this process to the industry's safety framework, permitting an

---

[14] *See* PPTA, *Use of the National Donor Deferral Registry Standard* (2008)
http://www.pptaglobal.org/images/IQPP_NDDR_V3_0.pdf.

[15] Appellant alleges that, based on his diagnosis of borderline schizophrenia, his name
was placed in the NDDR.  Aplt. App. at 9 ¶ 17.  He is either mistaken in this regard or his
name was placed in the NDDR in error.  As stated previously, a donor's name is only
placed in the NDDR if that donor has tested positive for one of three specific viruses.

interpretation of the ADA that would undermine its effectiveness cannot be what Congress intended.

## CONCLUSION

For the foregoing reasons, PPTA respectfully requests that the Court affirm the District Court's judgment.

Respectfully submitted,

/s/ John T. Delacourt_____
JOHN T. DELACOURT
JOSHUA PENROD
Plasma Protein Therapeutics Association
3050 K Street, NW
Suite 400
Washington, DC  20007
(202) 789-3100

JOSEPH A. BOYLE
Kelley Drye & Warren LLP
One Jefferson Road
2nd Floor
Parsippany, NJ  07054
(973) 503-5920

## STATEMENT REGARDING ORAL ARGUMENT

Because the outcome of this case will potentially impact plasma donors and plasma collection centers throughout the United States, as well as the quality and safety of both source plasma and the biological drug products manufactured from that plasma, the Plasma Protein Therapeutics Association respectfully requests that it be granted the opportunity to present its views at oral argument.

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type volume limitation imposed by Federal Rule of Appellate Procedure 29(d).  This brief was prepared with Microsoft Word 2013 and contains 4,488 words of proportionately spaced text.  The typeface is Times New Roman, 13-point font.

/s/ John T. Delacourt

JOHN T. DELACOURT

Dated: June 19, 2015

## CERTIFICATE OF DIGITAL SUBMISSION

I certify that the electronic version of the foregoing BRIEF FOR THE PLASMA

PROTEIN THERAPEUTICS ASSOCIATION AS *AMICUS CURIAE* IN SUPPORT OF

OCTAPHARMA PLASMA, INC. AND URGING AFFIRMANCE, prepared for

submission via ECF, complies with all required privacy redactions per Tenth Circuit Rule

25.5, is an exact copy of the paper copies submitted to the Tenth Circuit Court of

Appeals, and has been scanned with the most recent version of ESET NOD32 and is virus

free.

/s/ John T. Delacourt
JOHN T. DELACOURT

Dated: June 19, 2015

21

**CERTIFICATE OF SERVICE**

I hereby certify that on June 19, 2015, I electronically filed the foregoing BRIEF FOR THE PLASMA PROTEIN THERAPEUTICS ASSOCIATION AS AMICUS CURIAE IN SUPPORT OF OCTAPHARMA PLASMA, INC. AND URGING AFFIRMANCE with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.  Seven copies of the same were sent by Federal Express to the Court.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Joseph A. Boyle_____
JOSEPH A. BOYLE