Case No. 14-4162

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**
_____

BRENT LEVORSEN

Plaintiff-Appellant

v.

OCTAPHARMA PLASMA, INC.

Defendant-Appellee

_____

Appeal from the United States District Court
For the District of Utah, No. 2:14-cv-00325
The Honorable Dustin B. Pead, Magistrate Judge, Presiding
_____

## REPLY BRIEF OF PLAINTIFF-APPELLANT BRENT LEVORSEN

Sasha Samberg-Champion
Ryan C. Downer
Michael Allen
RELMAN, DANE & COLFAX PLLC
1225 19th Street N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888
(202) 728-0848 (fax)

Aaron M. Kinikini
Disability Law Center
205 North 400 West
Salt Lake City, UT 84103
(801) 869-2708
(801) 363-1437 (fax)

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

SUMMARY OF ARGUMENT .................................................................1

ARGUMENT ...........................................................................................3

    I.    The Term "Service Establishment" Readily Encompasses
        Plasma Banks.................................................................................3

        A.  "Service Establishment" Is a Broad and Flexible Term
           that Extends Beyond Octapharma's Cramped Definition....................3

        B. DOJ Regulations, Which Are Entitled to Deference,
           Confirm that "Service Establishment" Should Be
           Construed Broadly..............................................................15

        C. Supreme Court Precedent Requires a Broad
           Interpretation of "Service Establishment" .........................................19

    II.    Title III Coverage Is Fully Consistent with FDA Regulation
        of the Plasma Industry .................................................................20

CONCLUSION .....................................................................................28

i

# TABLE OF AUTHORITIES

**Cases**                                                                **Page**

*Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555 (1999) .....................................25, 26

*Bragdon v. Abbott*, 524 U.S. 624 (1998) ......................................................16, 18, 23

*Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73 (2002)...........................................22

*In re Chippendales USA, Inc.*, 622 F.3d 1346 (Fed. Cir. 2010) .............................14

*Colorado-Cross Disability Coal. v. Abercrombie & Fitch Co.*,
765 F.3d 1205 (10th Cir. 2014) ................................................................................15

*Doe v. Mut. of Omaha Ins. Co.,* 179 F.3d 557 (7th Cir.1999)...........................10, 26

*Doran v. 7-Eleven, Inc.*, 524 F.3d 1034 (9th Cir. 2008)..............................................8

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)........................1

*Graham Cnty. Soil and Water Conservation Dist. v. United States
ex rel. Wilson*, 559 U.S. 280 (2010)...........................................................................1

*Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448 (5th Cir. 2013) ................................20

*Johnson v. Gambrinus Co.*, No. V-94-040, 1995 WL 564353 (S.D.
Tex. June 8, 1995)......................................................................................................24

*Johnson v. Gambrinus Co.*, No. V-94-040, 1995 WL 584043
(S.D. Tex. Aug. 22, 1995)............................................................................................8

*Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190 (1966) ................................11

*Island Software & Computer Serv., Inc. v. Microsoft Corp.*,
413 F.3d 257 (2d Cir. 2005).......................................................................................14

*King v. Burwell*, No. 14-114, 2015 WL 2473448 (U.S. June 25, 2015) .........1, 5, 14

*Larsen v. Carnival Corp., Inc.*, 242 F. Supp. 2d 1333 (S.D. Fla. 2003) .................22

*Lockett v. Catalina Channel Express, Inc.*, 496 F.3d 1061
(9th Cir. 2007) ....................................................................................23

*Miller v. Amusement Enters. Inc.*, 394 F.2d 342 (5th Cir. 1968) ............................6

*Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117
(1991) ...........................................................................................5

*Olinger v. U.S. Golf Ass'n*, 205 F.3d 1001 (7th Cir. 2000) .......................................7

*PGA Tour, Inc. v. Martin*, 532 U.S. 661 (2001) ...........................................3, 19, 20

*Reich v. Continental Cas. Co.*, 33 F.3d 754 (7th Cir. 1994)....................................20

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) .....................................................17

*Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119 (2005).................................19

*Toomer v. City Cab*, 443 F.3d 1191 (10th Cir. 2006)..............................................19

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
959 F.2d 468 (3d Cir. 1992)................................................................20

*United States v. Alpers*, 338 U.S. 680 (1950) ..........................................................6

*United States v. Mead Corp.*, 533 U.S. 218 (2001) .................................................17

*Vitek Sys., Inc. v. Abbott Labs.*, 675 F.2d 190 (8th Cir. 1982) ...............................14

## Federal Statutes and Regulations

21 C.F.R. § 640.63 ...............................................................................23

28 C.F.R. Chpt. 1, Part 36, App. C ....................................................7, 16

28 C.F.R. § 36.208 ...............................................................................22

28 C.F.R. § 36.301 ..........................................................................22, 27

iii

29 C.F.R. § 779.315 ...................................................................................11, 12

29 C.F.R. § 779.317 ........................................................................................11

56 Fed. Reg. 35,544-01 ...................................................................................22

15 U.S.C. § 1127 .............................................................................................13

42 U.S.C. § 12101 ...............................................................................3, 12, 15

42 U.S.C. § 12181 ....................................................................................10, 28

42 U.S.C. § 12182.............................................................................10, 22, 27

42 U.S.C. § 12186 ....................................................................................18, 19

42 U.S.C. § 12188 ...........................................................................................18

42 U.S.C. § 12201 ...........................................................................................24

42 U.S.C. § 12206 ...........................................................................................18

**Legislative History**

H.R. Conf. Rep. No. 101-558 (1990)....................................................................6

H.R. Rep. No. 101-485, Pt. II (1990)................................................................14

S. Rep. No. 101-116, at 54 (1989) ...................................................................15

**Other Authorities**

USPTO, *Trademark FAQs*, *available at*
http://www.uspto.gov/learning-and-resources/trademark-faqs ................................13

U.S. Dept. of Justice, Civil Rights Division, ADA Title III Technical
Assistance Manual, *available at* http://www.ada.gov/taman3.html ........................16

U.S. Dept. of Justice, Civil Rights Division, *Settlement Agreement Between The United States of America And Bio Medics*, *available at* http://www.ada.gov/bio-medics.htm.........................................................................18

## SUMMARY OF ARGUMENT

As the Supreme Court regularly reminds us, in construing statutory provisions, courts "must read the words 'in their context and with a view to their place in the overall statutory scheme.'"  *King v. Burwell*, No. 14-114, slip op. at 9 (U.S. June 25, 2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).  A court's "duty, after all, is 'to construe statutes, not isolated provisions.'"  *Id.* (quoting *Graham Cnty. Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010)).

Octapharma nonetheless asks this Court to construe the term "service establishment" entirely divorced from the larger context within which Congress used the term in Title III of the ADA.  It does so because even a passing glance at that context defeats its argument.  As the legislative history makes clear, as the Supreme Court and other courts have repeatedly stated, and as the Department of Justice (DOJ) has confirmed in its regulations and in its filing here, Congress intended Title III to cover every commercial establishment open to the public.

Octapharma argues that the term "service establishment" so clearly excludes plasma banks that this Court should ignore: the words of the Supreme Court (which it dismisses as dicta), unambiguous legislative history (which it says is irrelevant), and the position of the United States (which it asserts deserves no deference).  Its textual argument fails.  "Service establishment," like the other

1

eleven categories by which Title III defines "public accommodation," can and should be read broadly enough to accomplish Congress's evident purpose. That Octapharma *also* is a manufacturer, and is not open to the public in all of its operations, is irrelevant to whether it is a public accommodation with respect to its operations that *do* serve the public.

Perhaps recognizing that its textual argument alone cannot prevail, Octapharma strains to explain why Congress intended to exempt plasma banks, alone, from non-discrimination requirements to which every other commercial establishment open to the public is subject. It proffers extensive discussion of Food and Drug Administration regulations governing plasma banks that, it argues, are inconsistent with Title III's requirements. Octapharma does not contend that FDA regulations required it to engage in the discrimination described in Mr. Levorsen's complaint. Rather, it speculates that hypothetical situations might arise in which Title III compliance would necessitate deviation from FDA requirements protecting public safety. This argument is based on an incomplete reading of Title III, which has a "public safety" exception and other provisions that account for precisely such situations.

Exempting plasma banks from Title III is unnecessary for compliance with FDA regulations, ensuring public safety, or any other legitimate purpose. Such an

exemption would serve only to permit plasma banks to engage freely in the sort of irrational disability discrimination that is alleged here.

## ARGUMENT

### I.     The Term "Service Establishment" Readily Encompasses Plasma Banks

As Mr. Levorsen and the United States demonstrated in their opening briefs, the term "service establishment" is broad enough to cover plasma banks.  That is particularly so in light of the ADA's stated purpose to ensure the "full[] participat[ion]" of individuals with disabilities in "all aspects of society", 42 U.S.C. § 12101(a)(1), and the abundant legislative history – recognized by the Supreme Court – demonstrating Congress's intent that Title III guarantee individuals with disabilities "equal access to the wide variety of establishments available to the nondisabled."  *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 676-77 (2001) (internal quotation marks omitted).  Octapharma's arguments to the contrary are meritless.

#### A. "Service Establishment" Is a Broad and Flexible Term that Extends Beyond Octapharma's Cramped Definition

Octapharma contends that its cramped conception of "service establishment" simply comports with the term's "ordinary, everyday sense."   Octapharma Br. at 14 (citing *Toomer v. City Cab*, 443 F.3d 1191, 1194 (10th Cir. 2006)).  But it fails to prove any "ordinary, everyday" use of the term "service establishment" that is as

circumscribed as Octapharma would have it.  All that Octapharma can demonstrate is that the term is used and defined quite differently across statutory schemes.

As Mr. Levorsen demonstrated in his opening brief, at least *some* of the many "ordinary" uses of the term (as found in dictionaries and judicial decisions) readily cover plasma banks.  Mr. Levorsen need show no more in light of the clear statutory purpose.  *See* Leverson Br. at 12-13.  In response, Octapharma states in conclusory fashion that it, and not Mr. Levorsen, is citing "[t]he most relevant dictionary definition."  Octapharma Br. at 16.  While that statement is debatable, the larger truth is that dueling dictionary definitions support Mr. Levorsen's argument, not Octapharma's.  And Octapharma has no real answer to the DOJ's point that certain state laws (and industry marketing materials) explicitly define procurement of plasma as a "service."  *See* Br. for United States at 14-15.  It says in a footnote that those laws have limited effect on plasma banks' tort-law liability, *see* Octapharma Br. at 19 n.9, without addressing the larger point that plasma banks are regularly defined and spoken of as service providers.

Octapharma nonetheless proffers three limited (and not entirely consistent) constructions of the term "service establishment."  First, it offers a half-hearted defense of the argument it convinced the district court to adopt, *i.e.*, that a service establishment must be paid by its patrons rather than vice-versa.  Explicitly abandoning the argument "that the nature of the transaction is dispositive,"

4

Octapharma Br. at 14, Octapharma nonetheless maintains that "the direction the funds travel would be an 'ordinary, everyday' way to identify the provider and recipient of any service." *Id.* at 14-15.  Later, it argues that courts should attempt to identify the "common theme" of the examples Congress chose as illustrative service establishments and exclude any entities not sharing that theme.  *Id.* at 23.  This argument remains unconvincing.[1]

The canons of construction upon which Octapharma relies are only rules of thumb for discerning the meaning of ambiguous terms; they do not apply "when the whole context dictates a different conclusion." *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991); *see, e.g.*, *Burwell*, slip op. at 14 ("rigorous application of the [surplusage] canon does not seem a particularly useful guide to a fair construction of the statute").  Here, where Congress clearly intended that the illustrative examples not be used to limit the scope of Title III – and chose statutory language to enact that preference – canons of construction should not be employed to subvert that intent.

---

[1] Acknowledging that many sales establishments pay the public for goods rather than vice-versa, Octapharma confidently states that "of course," all such establishments "also sell goods to the public," and so they qualify as sales establishments under Octapharma's construction.  *See* Octapharma Br. at 15 n.6.  Octapharma offers no support for its assertion that all establishments that buy goods from the public also sell similar goods.

Congress specifically considered and rejected language that would have required "other service establishments" to be "other *similar* service establishments." It did so precisely to defeat arguments such as the ones Octapharma now makes. H.R. Conf. Rep. No. 101-558, at 61 (1990) (emphasis added); Leverson Br. at 16-17. Octapharma downplays the significance of this choice, speculating that Congress "simply wanted to avoid confusing readers." Octapharma Br. at 28. But no speculation is required: Congress made clear that it intended the twelve categories to be construed as broadly as possible and not be confined to entities "similar" to the illustrative examples.

*Ejusdem generis* and other statutory canons cannot compel this Court "to interpret the statute in such a narrow fashion as to defeat . . . its obvious and dominating general purpose." *Miller v. Amusement Enters. Inc.*, 394 F.2d 342, 350 (5th Cir. 1968) (en banc); *accord United States v. Alpers*, 338 U.S. 680, 682 (1950). Here, the ADA's clear "dominating" purpose of ensuring equal access to all aspects of society requires a broad reading of the term "service establishment" that is not artificially confined by reference to the illustrative examples. This is not a surprising result, let alone an irrational one. Rather, it is exactly the result Congress intended.[2]

---

[2] Moreover, as explained at length in the Opening Brief, the services provided by plasma banks are not so different from the listed examples as to be clearly

Second, Octapharma argues that service establishments "are *in business to serve*," Octapharma Br. at 15 (emphasis in original), whereas it is in the business of manufacturing source plasma, *id.* at 16. Because plasma banks are fundamentally "manufacturers," Octapharma argues, it is irrelevant that what Octapharma calls its "manufacturing process" includes the provision of certain services to the public. *Id.* at 15. But Title III, its implementing regulations, and the caselaw construing the statute say otherwise. Any entity is covered by Title III to the extent (and only to the extent) that it operates as a public accommodation, notwithstanding that other activity may be its *raison d'etre*.

Octapharma operates what the Justice Department regulations term a "mixed use facilit [y]." *See* 28 C.F.R. Ch. 1, Part 36, App. C at 893. Accordingly, it "is a place of public accommodation for purposes of the ADA to the extent that its operations include those types of activities engaged in or services provided by the facilities contained on the list of 12 categories." *Id.*; *accord Olinger v. U.S. Golf Ass'n*, 205 F.3d 1001, 1004 (7th Cir. 2000) ("[A]n entity may simultaneously be both a place of public accommodation and a place that is not fully subject to Title III – in other words, a 'mixed use' facility."), *vacated on other grounds*, 532 U.S.

---

excluded. *See* Leverson Br. at 22; *see also* Br. of United States at 22 (identifying alternative "themes" of the listed examples that are consistent with plasma banks).

1064 (2001).   It is irrelevant how significant those activities subject to Title III's requirements are to the company's larger operations.

For example, a manufacturing plant may not ordinarily be a public accommodation, but it is one when it hosts public tours.  *See Johnson v. Gambrinus Co.*, No. V-94-040, 1995 WL 584043, at *11-13 (S.D. Tex. Aug. 22, 1995), *aff'd sub nom. Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052 (5th Cir. 1997).  By contrast, while public areas of a retail establishment are subject to public accommodation requirements, employee-only bathrooms are not. *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1048 (9th Cir. 2008).

It thus is immaterial whether and to what extent Octapharma is a manufacturer, for purposes of the FDA's regulatory scheme or otherwise.  What matters is that Octapharma is *also* a provider of services to the public.  As Octapharma acknowledges, it is unlike other manufacturers in that its "raw material input comes from the human body."  Octapharma Br. at 19.  This reality requires it to assume the functions of a service provider before it can engage in manufacturing.

Plasma banks welcome into their facilities members of the public.  They then provide a number of services directly to the public to make possible the

ultimate transaction of blood for money.[3]  Plasma banks employ medical professionals to supervise or conduct examinations and blood extractions.  Donors are screened and their blood is tested and processed, consistent with activities that take place at a doctor's office.[4]  This is all part of a bargained-for exchange between the plasma banks and individual donors.  *See* Leverson Br. at 19-20.

Thus, unlike a paper mill or an orange juice factory, which typically has no interaction with members of the community, Octapharma Br. at 19, Octapharma relies on interaction with the general public as part of its business plan.  Of course, if the orange juice factory opened its doors to the public, and relied upon the public to bring oranges as the "raw material" for the factory to process, *see id.* at 19, those public-facing activities *would* be covered by Title III.  Octapharma's trade association amicus similarly fails to understand that it is the *public interaction* that makes a public accommodation, incorrectly asserting that Mr. Levorsen's position

---

[3]  Octapharma's trade association acknowledges that much of what blood banks do is readily characterized as the provision of services, but argues that the beneficiaries of those services are the general public, not the donors.  *See* Br. for the Plasma Protein Therapeutics Association at 6-7.  But the donor *does* receive a benefit – the ability to monetize an asset that otherwise could not be exchanged for money.  That the general public *also* benefits is of no moment.

[4] Octapharma misses the mark in pointing to various regulations that clarify that plasma collectors are not healthcare providers because, for example, their donors do not seek health care.  Octapharma need not *be* a healthcare provider to provide certain services that resemble those provided in a doctor's office.  Indeed, the fact that regulatory authorities find it necessary to state that plasma collectors are not healthcare providers indicates how similar their activities are.

is akin to arguing that "a cattle ranch provides 'beef procurement services.'"  Br. for the Plasma Protein Therapeutics Association at 11.  But Octapharma is more like a business that permits members of the public to bring their own cattle for slaughter and butchering.

The general rule is that, under Title III, a facility open to the public "cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do."  *Doe v. Mut. of Omaha Ins. Co.,* 179 F.3d 557, 559 (7th Cir.1999) (Posner, J.).  Octapharma need not make accessible its non-public, purely manufacturing operations.  But the public-facing parts of its operation must be equally accessible to individuals with disabilities, including Mr. Levorsen.[5]

Third, Octapharma suggests that "service establishments" are limited to entities that fulfill the public's "basic needs."  Plasma banks do not qualify, it

---

[5]  In a footnote, Octapharma advances the related argument that a public accommodation must have "clients" or "customers," whereas it has "donors." Octapharma Br. at 24 n.11.  This argument misunderstands the structure of Title III, which explicitly protects those who are *not* "clients" or "customers."  The provision on which Octapharma relies, 42 U.S.C. § 12182(b)(1)(A)(iv), does not modify Title III's general prohibition against discrimination, 42 U.S.C. § 12182(a), but rather only certain specified forms of discrimination.  In any event, Mr. Levorsen is just as much a "client" or "customer" (if not more so) as those who use many covered public accommodations, including elementary and nursery schools, libraries, convention centers, lecture halls, and museums.  *See* 42 U.S.C. § 12181(7)(D), (H), and (K).  It is immaterial to Title III what label the FDA chooses to put on the relationship for reasons that matter only to that regulatory scheme.

argues, because no one "need[s] to dispose of their plasma." Octapharma Br. at 12, 15 and n.7, 21, 24. This distinction may well fail on its own terms; Octapharma does not explain why Mr. Levorsen has less "need" for Octapharma's services – the income from which is critical to him, Applt. App. at 8 ¶ 11, 10 ¶ 21 – than he does for dry cleaning. But more fundamentally, it is not a distinction with relevance to Title III coverage.

Octapharma apparently draws its "basic needs" argument from a Fair Labor Standard Act regulation stating that a "retail or service establishment" typically "serves the everyday needs of the community in which it is located." Octapharma Br. at 17 (quoting 29 C.F.R. § 779.318(a)). That language helps delineate the "traditional local retail or service establishments" that receive certain exemptions (now mostly repealed) from FLSA's workplace protections. 29 C.F.R. § 779.315; *see also Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 193-94 (1966). It predominately applies to establishments that Title III would term "sales" establishments, not service establishments. Indeed, it explicitly excludes many businesses that undoubtedly are "service establishments" under Title III, including dry cleaners, banks, travel agencies, accountants' and lawyers' offices, insurance offices, and health care providers. 29 C.F.R. § 779.317.

Examination of this FLSA regulatory scheme simply confirms that a term such as "retail establishment" or "service establishment" must be construed against the context in which it is used.  Indeed, the FLSA regulations say as much:

> The term "retail" whether it refers to establishments or to the sale of goods or services is susceptible of various interpretations. When used in a specific law it can be defined properly only in terms of the purposes and objectives and scope of that law.

29 C.F.R. § 779.315.

A broad construction of the term under FLSA would exclude too many businesses from FLSA's protections; thus, the Department of Labor gives the term a narrow construction serving the statute's purposes.  By contrast, an expansive reading of "service establishment" is required to effectuate the ADA's purpose, which is that individuals with disabilities be provided the opportunity to "*fully participate in all aspects of society.*" 42 U.S.C. § 12101(a)(1) (emphasis added).[6] Resort to FLSA's or any other statute's specialized definition of "service" thus is inappropriate to inform construction of "service establishment" as Title III uses the term.

---

[6] Octapharma suggests that Congress could have effectuated this intent more simply by defining a "public accommodation" as "any business that is open to the public and affects commerce."  *See* Octapharma Br. at 19.  But the twelve categories that Congress used to define "public accommodation" cover more entities than Octapharma's formulation, because they also sweep in some (but not all) non-commercial entities open to the public.

For similar reasons, whether the FDA regulatory scheme defines Octapharma as a "manufacturer" when it carries out certain activities has no bearing on whether and when Octapharma is acting as a "service establishment" under Title III. *See, e.g.*, Octapharma Br. at 16-17. Both terms are used in a specialized way by statutory schemes serving very different purposes. There is no reason why Octapharma cannot be a "service establishment" for some purposes while being a "manufacturer" for others.

Indeed, Octapharma characterizes itself as a service provider for purposes of other statutory schemes. In 2009, the company applied for and was granted a registered service mark from the United States Patent and Trademark Office (USPTO). "Service marks" are "used by their owners to identify services, that is, intangible activities, which are performed by one person for the benefit of a person or persons other than himself, either for pay or otherwise." USPTO, *Trademark FAQs*, available at http://www.uspto.gov/learning-and-resources/trademark-faqs (last visited on July 6, 2015); *see also* 15 U.S.C. § 1127 (defining "service mark"). Consistent with that definition, both Octapharma's submitted application and its registered service mark certificate identify the company as providing "medical

*services*, namely medical *services* of a blood donation center." *See* Attachment A (emphasis added).[7]

* * * * *

The question is not whether Octapharma is a "service establishment" under all statutory schemes (though it would be under many), or as a layperson would use the term (though he or she might well think Octapharma fits the term). The question is whether Octapharma is a "service establishment" as that term is used in Title III's definition of "public accommodation." As the Supreme Court recently reminded us, "[a] fair reading of legislation demands a fair understanding of the legislative plan." *Burwell*, slip op. at 21. The "legislative plan" here could not be plainer.

Congress intended Title III to cover virtually any facility engaged in commercial activity that is "open to the public,"[8] H.R. Rep. No. 101-485, pt. 2, at

---

[7] This Court is entitled to take judicial notice of Octapharma's registered service mark. *See In re Chippendales USA, Inc.*, 622 F.3d 1346, 1356 (Fed. Cir. 2010); *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005); *Vitek Sys., Inc. v. Abbott Labs.*, 675 F.2d 190, 192 n.4 (8th Cir. 1982).

[8] Octapharma argues in a footnote that Congress did not mean what the legislative history clearly states, simply because it separately established accessible construction requirements for "commercial facilities," not all of which are public accommodations. *See* Octapharma Br. at 19-20 n.10. This was not, as Octapharma argues, because Congress anticipated that some commercial facilities open to the public would not be public accommodations. Rather, Congress required that all newly built commercial facilities be accessible (whether used immediately as public accommodations or not) both to facilitate Title I's

14

35 (1990), in accordance with the ADA's overall aim of ensuring that "physical or mental disabilities in no way diminish a person's right to fully participate in *all aspects* of society." 42 U.S.C. § 12101(a)(1) (emphasis added).  Accordingly, it intended that the twelve categories be interpreted "liberally" and "consistent with the intent of the legislation that people with disabilities should have equal access to the array of establishments that are available to others who do not currently have disabilities."  S. Rep. No. 101-116, at 54 (1989).  It would subvert Congress's clear intent to limit Title III's coverage by importing the narrower definition of "service provider" from other statutory schemes or other contexts in which the term is used for a different purpose.[9]

### B. DOJ Regulations, Which Are Entitled to Deference, Confirm that "Service Establishment" Should Be Construed Broadly

The Department of Justice's regulations interpreting Title III confirm that "service establishment" should be construed broadly, in the manner described

---

employment mandates (applicable to non-public businesses as well) and because certain facilities first used by non-public businesses later are used by public accommodations.  See H.R. Rep. No. 101-485, Pt. II, at 117 (1990).

[9] Octapharma repeatedly suggests that this Court's decision in *Colorado Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205 (10th Cir. 2014), somehow precludes clear legislative intent from informing proper interpretation of Title III.  *See* Octapharma Br. at 20, 25.  That case does no such thing.  Instead, it holds that a Title III violation based on failure to design and construct accessible facilities must be premised on the Justice Department's detailed regulations implementing design-and-construction requirements rather than the statute's "overarching aims."  *Colorado Cross-Disability Coal.*, 765 F.3d at 1220-21.

above.  These regulations state that the provision should not be limited to "the *types* of establishments listed" and that the covered entities "include an innumerable array of facilities that would *sweep far beyond* the few examples given in the regulation."  28 C.F.R. Ch. 1, Part 36, App. C at 893 (emphasis added).  This is because although the "list of *categories* is exhaustive, the *representative examples* of facilities within each category are not."[10]  *Id.* (emphasis added); *see also* Leverson Br. at 17-18.

Only by ignoring this clear statement in the DOJ's regulations regarding the expansive nature of "service establishment" and the other eleven categories of public accommodations can Octapharma insist that DOJ regulations simply "parrot[] the statutory language."  Octapharma Br. at 28.  In fact, the regulatory language cited above directly contradicts Octapharma's position "that courts should apply *ejusdem generis* and *noscitur a sociis* to resolve any ambiguity."  *Id.*

To the extent that the Title III definitions are unclear, DOJ regulations calling for a broad interpretation of "service establishment" are certainly entitled to *Chevron* deference.  *Bragdon v. Abbott*, 524 U.S. 624, 646 (1998).  Octapharma makes no claim to the contrary, arguing instead that the regulations do not answer the specific question before the Court – that is, whether plasma banks are "service

---

[10] *See also* U.S. Dept. of Justice, Civil Rights Division, ADA Title III Technical Assistance Manual, *available at* http://www.ada.gov/taman3.html (last visited on July 6, 2015).

establishments." Octapharma Br. at 28-29. But the regulations do address, and

definitively answer, the larger question of interpretive methodology. Having

staked out the position that Title III should be construed broadly to cover virtually

every commercial establishment open to the public, DOJ would have no reason

(nor, realistically, the ability) to address Title III's applicability to each and every

covered industry individually, as Octapharma appears to believe it was required to

do. *Id.* at 29.

Moreover, DOJ has expressed its views specific to plasma banks, as well as

the interplay between Title III and the FDA's regulations, in two amicus briefs

before this Court. These views are entitled to deference, because they are well-

supported and fully consistent with DOJ's Title III regulations. *Skidmore v. Swift*

*& Co.*, 323 U.S. 134, 140 (1944) ("The weight of [an agency's views] in a

particular case will depend upon the thoroughness evident in its consideration, the

validity of its reasoning, its consistency with earlier and later pronouncements, and

all those factors which give it power to persuade, if lacking power to control."); *see*

*also United States v. Mead Corp.*, 533 U.S. 218, 234-35 (2001) ("[A]n agency's

interpretation may merit some deference whatever its form, given the 'specialized

experience and broader investigations and information' available to the agency,

and given the value of uniformity in its administrative and judicial understandings

of what a national law requires.") (internal citation omitted).

17

The position the DOJ takes here flows logically from its consistent prior statements (including in promulgated regulations) regarding the proper methodology for construing the scope of Title III.  Additionally, DOJ has publicly settled a Title III action against a plasma bank.  *See* U.S. Dept. of Justice, Civil Rights Division, *Settlement Agreement Between The United States of America And Bio Medics*, available at http://www.ada.gov/bio-medics.htm (last visited on July 6, 2015).  It is, accordingly, difficult to understand how Octapharma can claim to be surprised by DOJ's position here, much less see DOJ's conduct as "sandbagging." Octapharma Br. at 30.

DOJ does not need specialized knowledge of each covered industry to assert in broad strokes that Title III applies, as Octapharma suggests.  Octapharma Br. at 31.  Congress granted DOJ the authority to enforce Title III against any covered business.  *See* 42 U.S.C. §§ 12186(b), 12188(b), and 12206(c); *see also Bragdon*, 524 U.S. at 646 (observing that DOJ is "the agency directed by Congress . . . to render technical assistance explaining the responsibilities of covered individuals and institutions . . . and to enforce Title III in court").  DOJ needs "specialized knowledge" of the plasma industry no more than it needs special knowledge of the internal operations of beauty shops, travel services, and dry cleaners.  Such specialized knowledge could matter only as to certain details of *how* Title III

applies, such as application of the direct threat and public safety defenses.[11]  With

respect to such details, DOJ appears to defer to the FDA's regulations, precisely as

Octapharma contends it should.  *See* Reply Br. for United States at 4.

### C. Supreme Court Precedent Requires a Broad Interpretation of "Service Establishment"

The Supreme Court has stated that Title III must be "construed liberally to

afford people with disabilities equal access to the wide variety of establishments

available to the nondisabled."  *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 676-77

(2001) (citation to legislative history omitted); *see also Spector v. Norwegian

Cruise Line Ltd.*, 545 U.S. 119, 132 (2005) (Title III was "designed to provide

broad protection for the disabled").  As the Court explained, the ADA's purpose is

"to eliminate discrimination against disabled individuals, and to integrate them

'into the economic and social mainstream of American life.'"  *PGA Tour, Inc.*, 532

U.S. at 675 (citing legislative history).  These statements cannot be reconciled with

---

[11] Octapharma incorrectly suggests that *Toomer v. City Cab*, 443 F.3d 1191 (10th Cir. 2006), supports its position that the FDA, not the DOJ, determines whether Title III applies to industries regulated by the FDA.  *See* Octapharma Br. at 17. But *Toomer* involved a different provision of the ADA involving discrimination in the provision of transportation services, with respect to which "Congress explicitly vested the Secretary of Transportation with the authority" for implementation. *Toomer*, 443 F.3d at 1196.  Here, the agency to which Congress has delegated comparable authority to implement and interpret the relevant provisions of Title III is the Department of Justice, not the FDA.  *See* 42 U.S.C. § 12186(b).

Octapharma's position that Title III applies only to *some* of the "wide variety of establishments available to the nondisabled."  *PGA Tour, Inc.*, 532 U.S. at 662.

Octapharma dismisses *PGA Tour*'s articulation of Title III's broad purpose and scope as dicta.  Octapharma Br. at 21.  But *PGA Tour*'s statements about Title III's intended breadth were as relevant and necessary to that case as they are to this one.  And "[e]ven assuming it is dictum," this Court should "give serious consideration to this recent and detailed discussion of the law by a majority of the Supreme Court."  *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013); *accord Reich v. Continental Cas. Co.*, 33 F.3d 754, 757 (7th Cir. 1994) (the Supreme Court's "recent dictum . . . provides the best, though not infallible, guide to what the law is").  Not uncommonly, the Supreme Court "uses dicta to give guidance to the lower court."  *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 495 n.41 (3d Cir. 1992).  Accordingly, the Court's analysis of Title III's purpose and intent cannot be casually disregarded.

## II.    Title III Coverage Is Fully Consistent with FDA Regulation of the Plasma Industry

Attempting to explain why Congress might have wanted plasma banks – alone out of all commercial entities open to the public – carved out of Title III's coverage, Octapharma leans heavily on FDA regulation of the plasma industry.  It argues that Title III's obligations are inconsistent with FDA regulations, such that plasma bank compliance with Title III would endanger the public health.  But Title

20

III is far more nuanced than that.  It includes a public safety defense and other provisions that ensure that the parade of horribles Octapharma envisions will never come to pass.  Title III is crafted to apply readily to industries, such as the plasma industry, that are both heavily regulated and must take into account public health considerations.

As an initial matter, despite its extensive discussion of the FDA regulatory scheme, Octapharma does not contend – nor could it – that any aspect of that scheme required it to discriminate against Mr. Levorsen as alleged here.  Nor can it point to another incident in which FDA and Title III requirements have come into conflict.  Nor, finally, can it point to any statement by the FDA suggesting in any way that standard application of Title III would endanger public safety.

There is a good reason why such a conflict has not arisen:  nothing in Title III prohibits Octapharma and other plasma centers from screening out individuals with disabilities who are unfit to donate or from otherwise complying with FDA regulations.  To the contrary, Title III provides precisely the "safe harbor" for legitimate exclusions for public safety reasons (such as those set forth in FDA regulations) that Octapharma inexplicably contends that Title III lacks.  Octapharma Br. at 37.  All Title III prohibits is *arbitrary* or *unjustified* exclusions of individuals with disabilities, such as are alleged here.

DOJ regulations provide that "[a] public accommodation may impose legitimate safety requirements that are necessary for safe operation," so long as those criteria are based on "actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities."  28 C.F.R. § 36.301(b). Covered entities may "impose neutral rules and criteria that screen out, or tend to screen out, individuals with disabilities, if the criteria are necessary for the safe operation of the public accommodation." 56 Fed. Reg. 35,544-01 (July 26, 1991); *see also* 28 C.F.R. § 36.301(a).

Further, Title III's "direct threat" provision permits refusals based on "a significant risk to the health or safety of others." 42 U.S.C. § 12182(b)(3); *see also* 28 C.F.R. § 36.208 (the ADA "does not require" a public accommodation to serve a disabled individual "when that individual poses a direct threat to the health or safety of others").[12]  Moreover, while this Court need not consider the question, Octapharma in an appropriate case may argue that service providers that must make on-the-spot judgments receive heightened protection.  *See* Octapharma Br. at

---

[12] Though this statutory and regulatory language by its terms only applies to threats "to the health or safety of *others*," some courts have held that a service provider similarly may exclude a disabled individual out of concern for that individual's own well-being.  *Larsen v. Carnival Corp., Inc.*, 242 F. Supp. 2d 1333, 1344-48 (S.D. Fla. 2003); *see also Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73 (2002) (upholding EEOC regulation that extended the analogous "direct threat" exception in employment discrimination under Title I of the ADA to encompass threat-to-self justifications).  That argument is not before this Court.

36.  At least one court has held that a service provider may exclude an individual with a disability for a reason that proves mistaken, so long as the judgment is "reasonable" on the basis of "available medical knowledge and objective evidence." *Lockett v. Catalina Channel Express, Inc.*, 496 F.3d 1061, 1066 & n.5 (9th Cir. 2007); *cf. Bragdon v. Abbott*, 524 U.S. 624, 649 (1998) (requiring "objective evidence" to establish a direct threat defense).

Of course, as the public accommodation has more time to evaluate the situation – and more medical and other evidence before it – it necessarily will need surer justifications for excluding an individual with a disability. *See Lockett*, 496 F.3d at 1066 (public accommodation did not violate Title III by making initial, rushed judgment of exclusion, but subsequently it "may well have violated the ADA had it not changed its policy").  Octapharma will have to explain not only why it initially excluded Mr. Levorsen, but why it continued to do so even in the face of two doctor's notes explaining that he was fit to give plasma.

As the DOJ explains, see Reply Br. for United States at 4, the Title III regulations described above dovetail seamlessly with the FDA's requirements that donors be in "good health on the day of donation," 21 C.F.R. § 640.63(c), and that plasma banks develop protocols for assessing donor eligibility, *id.* at § 606.100. Accordingly, there is a simple answer to Octapharma's rhetorical question as to what it should do "when a disabled individual wants to donate but does not meet

Octapharma's FDA-approved donor suitability standards." Octapharma Br. at 32.

Octapharma can reject the would-be donor, secure in the knowledge that Title III

provides safe harbor for legitimate denials based on FDA standards.

There is, accordingly, no reason to carve out a categorical exemption from

Title III for this or any other industry because of imagined conflict with other

regulations governing that industry. *See Johnson v. Gambrinus Co.*, No. V-94-

040, 1995 WL 564353, at *3 (S.D. Tex. June 8, 1995) (rejecting argument that

subjecting beer manufacturer to Title III requirements "would necessarily present it

with a Hobson's choice between compliance with antidiscrimination laws and

compliance with public health laws"). And because Congress and the DOJ have

set out general principles for applying the ADA to heavily regulated industries,

there is no reason to expect them to recapitulate those principles with respect to

each specific industry, contrary to Octapharma's argument. *See* Octapharma Br. at

36-37.[13]

At stake here is not whether the FDA regulatory scheme will be undermined,

but rather whether plasma donation centers will have unfettered license to

_____

[13] Octapharma misunderstands the import of the ADA's safe harbor for insurance
companies. *See* Octapharma Br. at 36. That provision provides that insurance
companies have safe harbor from ADA liability so long as their underwriting
standards are consistent with *state* law. *See* 42 U.S.C. 12201(c). It thus functions
as an anti-preemption provision, in recognition of the fact that the insurance
industry is largely governed by state law rather than federal law.

discriminate against donors with disabilities in ways completely unmoored from the FDA regulations.[14]  Even the plasma industry believes its membership should not be free to "make the blanket statement 'we don't serve people who have disabilities,'" Br. for the Plasma Protein Therapeutics Association at 14, yet it advances a construction of Title III that would permit such a statement.

Octapharma erroneously relies on *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555 (1999), to bolster its assertion that the existence of relevant FDA regulations exempts plasma donation centers from Title III as a matter of law.  *See* Octapharma Br. at 34-35.   To the contrary, *Kirkingburg* demonstrates how the ADA's requirements are readily harmonized with those arising under separate regulatory schemes, making categorical exemption of industries from the ADA unnecessary.

*Kirkingburg* did not involve a dispute over the *applicability* of the relevant title of the ADA – in that case, Title I, which governs employment.  Rather, the question was whether a Department of Transportation regulation provided an employer a complete defense to liability.  Specifically, the issue was whether the

---

[14] The DOJ's settlement with Bio-Medics is instructive as to the kinds of discrimination – having nothing to do with FDA regulation – that would be permissible should Octapharma and its trade association's position be adopted. That settlement precludes the plasma center from, for example, excluding those who have visual or auditory impairments on the basis of disability. *See* Reply Br. for United States at 4-5.

25

employer could rely on a federal eyesight standard for commercial truck drivers to demonstrate a legitimate safety justification for terminating a driver who failed to meet that standard. *Kirkingburg*, 527 U.S. at 560-62, 567.

    *Kirkingburg* held that so long as such a regulation reflects a federal agency's judgment about the minimum employment qualifications necessary, an employer may rely on the federal standard alone as a defense to Title I liability. *Id.* at 577-78. The Court thus affirmed the principle that compliance with federal regulations will not make an employer liable under the ADA. Nothing in its holding or reasoning suggests that the employer should not be subject to ADA coverage in the first place.[15] Instead, *Kirkingburg* suggests that Octapharma is simply mistaken in contending that a plasma bank would have to justify on a case-by-case basis "an eligibility decision mandated by the FDA." Octapharma Br. at 2-3.

    Similarly, in *Spector v. Norwegian Cruise Line Ltd.*, the Supreme Court harmonized Title III with the International Convention for the Safety of Life at Sea (SOLAS). 545 U.S. at 128-29. Rejecting the argument that Title III did not reach foreign cruise ships at all, *id*. at 125, 129-30, 135-36, the Court construed Title III's mandate for the removal of physical barriers if such removal is "readily

---

[15] *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557 (7th Cir. 1999), similarly does not support Octapharma's argument that it should be wholly exempt from Title III. That case held that insurers *are* public accommodations. It went on to hold that Title III could not require an insurer to alter the terms of a policy "to make it equally valuable to the disabled." *Id.* at 563.

achievable," 42 U.S.C. § 12182(b)(2)(A)(iv), to create no conflict with SOLAS. *Spector* noted that "a barrier-removal requirement under Title III that would bring a vessel into noncompliance with [SOLAS], or any other international legal obligation, would create serious difficulties for the vessel and would have a substantial impact on its operation, and thus would not be 'readily achievable.'" *Id*. at 135-36 (internal citations omitted). Thus, while Title III applies, its barrier removal provisions create no conflict with safety standards mandated by international law.

Title III functions similarly with respect to the plasma industry. To the extent that FDA regulations require eligibility criteria or other practices that exclude individuals with disabilities based on legitimate safety concerns, Title III does not compel noncompliance with those regulations. *See* 28 C.F.R. 36.301(b); 42 U.S.C. § 12182(b)(3). Of course, unlike the defendants in *Kirkingburg* or *Spector*, Octapharma nowhere asserts that any specific FDA requirement compelled its actions here.

As the discussion above suggests, that the FDA requires Octapharma to screen out individuals inappropriate for donation in no way means that plasma donation is not "an activity that is open to the public." Octapharma Br. at 35. Numerous places of public accommodation impose legitimate eligibility criteria that exclude members of the public from full access to the public accommodation's

services.  Adoption agencies and welfare agencies, *see* 42 U.S.C. § 12181(7)(K), may apply suitability criteria.  Private schools and universities, see *id.* at § 12181(7)(J), need not offer admission indiscriminately.  Many who seek a loan from a bank, *id.* at § 12181(7)(F), will be turned away permissibly for failure to satisfy lending requirements.

Being "open to the public" does not require the abandonment of legitimate neutral selection criteria.  It simply requires that such selection criteria, as well as the plasma industry's other practices, be truly justified and non-discriminatory.

## CONCLUSION

The "revolution" that Octapharma describes, *see* Octapharma Br. at 37, was mandated by Congress 25 years ago.  Title III is a key part of the ADA, legislation that was indeed revolutionary in guaranteeing that all Americans have a right to fully participate in all aspects of public life regardless of their physical or intellectual disabilities.

Title III's plain language, its legislative history, and the regulations construing it make clear that it was intended to apply to all commercial entities open to the public, including, but certainly not limited to, plasma banks like the one at issue here.  Because it applies to such a diverse set of entities – including those that, like plasma banks, are heavily regulated and must consider public safety concerns – Title III is drafted to accommodate all of the legitimate needs that

Octapharma articulates in its brief.  What it does not permit is behavior such as that alleged in the complaint – the exclusion of individuals with disabilities based on unthinking and unfounded stereotypes.

This Court should hold that Title III applies to plasma banks.  It should reverse the district court and remand for further proceedings.


Respectfully submitted,

/s/ Sasha Samberg-Champion
Sasha Samberg-Champion
Michael Allen
Ryan C. Downer
RELMAN, DANE & COLFAX PLLC
1225 19th Street N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888
(202) 728-0848 (fax)

Aaron M. Kinikini
Disability Law Center
205 North 400 West
Salt Lake City, UT 84103
(801) 869-2708
(801) 363-1437 (fax)

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I hereby certify that this brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. This brief contains 6,868 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I further certify that this brief complies with the typeface and type style requirements of Rule 32(a)(5)-(6) of the Federal Rules of Appellate Procedure. The brief has been prepared in proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman for the main text and footnotes.


/s/ Sasha Samberg-Champion
Sasha Samberg-Champion


Date: July 6, 2015

**CERTIFICATE OF DIGITAL SUBMISSION**

I certify that the electronic version of the foregoing REPLY BRIEF OF

PLAINTIFF- APPELLANT BRENT LEVORSEN, prepared for submission via

ECF, complies with all required privacy redactions per Tenth Circuit Rule 25.5, is

an exact copy of the paper copies submitted to the Tenth Circuit Court of Appeals,

and has been scanned with Symantec Endpoint Protection and is virus-free.


/s/ Sasha Samberg-Champion
Sasha Samberg-Champion


Date: July 6, 2015

## CERTIFICATE OF SERVICE

I hereby certify on July 6, 2015, I electronically filed the foregoing REPLY

BRIEF OF PLAINTIFF-APPELLANT BRENT LEVORSEN with the Clerk of the

Court for the United States Court of Appeals for the Tenth Circuit by using the

appellate CM/ECF system. I certify that all participants in this case are registered

CM/ECF users and that service will be accomplished by the appellate CM/ECF

system.

In addition, I certify that on July 7, 2015, I will serve seven paper copies of

the same by Federal Express to the Court.


/s/ Sasha Samberg-Champion
Sasha Samberg-Champion